Anthony P. CATANZARO, Plaintiff,

v.

MASCO CORP., Defendant.

Edward T. MOLINARO and Anthony P. Catanzaro, Plaintiffs,

v.

RADIO CORPORATION OF AMERICA et al., Defendants.

Edward T. MOLINARO and Anthony P. Catanzaro, Plaintiffs,

v.

ROCKWELL INTERNATIONAL et al., Defendants.

Civ. A. Nos. 4780, 75–103 and 75–169.

United States District Court, D. Delaware.

Oct. 29, 1976.

Anthony P. Catanzaro and Edward T. Molinaro, pro se.

Jacob C. Kellem, of Connolly, Bove & Lodge, Wilmington, Del., for defendant Masco in Civ. A. No. 4780, defendant Midland in Civ. A. No. 75–103, and defendants Rockwell, Honeywell, GTE Sylvania, Raytheon and Magnavox in Civ. A. No. 75–169.

Rodney M. Layton, of Richards, Layton & Finger, Wilmington, Del., for defendant RCA in Civ. A. No. 75–103.

William O. LaMotte, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant Motorola in Civ. A. No. 75–103.

Douglas E. Whitney, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant Bendix in Civ. A. No. 75–169.

Bruce M. Stargatt, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant Fairchild Camera & Instrument in Civ. A. No. 75–169.

OPINION

STAPLETON, District Judge.

I. BACKGROUND

These three infringement actions involve Patent No. 2,906,875 (September 29, 1959), issued to Edward T. Molinaro (hereinafter the "Molinaro patent"). The subject matter of this patent is a type of signal-seeking receiver. Signal-seeking receivers, as the term is broadly used, are devices which scan a frequency spectrum in search of a signal and stop when a signal being broadcast is encountered.

According to the plaintiffs, the Molinaro patent covers at least those signal-seeking receiver devices which:

1. have a power-operated means of tuning successively to signals in a frequency range;

2. have a means for stopping the tuning in response to a received signal;

3. have a means for automatically restarting the tuning after a predeterminal duration of pause; and

4. have a user-operated means for preventing the automatic restart of tuning.[1]

An example of such a device, as the Molinaro patent specification and file wrapper make clear, would be an automobile radio which automatically tunes from station-to-station, stopping long enough on each to allow the driver to determine whether he wants to listen to the program being presented, and containing a mechanism (a switch, e. g.,) whereby the driver could stop the tuning at a station whose programming he desires to hear.[2]

Presently before me are three summary judgment motions on grounds of non-infringement; one summary judgment motion on grounds of invalidity; and what amounts to a summary judgment respecting the scope of the patent-in-suit. In order to put the present proceedings into perspective, and to provide a basis for understanding certain arguments which plaintiffs have raised, a procedural history of these three cases is in order.

On December 20, 1973, plaintiff Catanzaro, who is the assignee of a fifty percent interest in the patent-in-suit, filed Civil Action No. 4780 in this Court. In the complaint, Masco Corporation, the sole surviving defendant in the action, was charged with infringement of the Molinaro patent, and, specifically, it was alleged in paragraph 6 of the complaint, that the "Bearcat" and "Pinto" automatic scanning receivers, and the "Jolly Roger" scanning monitor receiver manufactured by a Masco subsidiary constituted infringing products.

After Masco had answered, but before any discovery had commenced,[3] the Judicial Panel On Multi-District Litigation transferred Civil Action No. 4780 to the Southern District of New York, along with seven similar actions, for consolidated pre-trial proceedings.[4] The rationale for such consolidation was the avoidance of unnecessary inconvenience to the plaintiffs and their

1. See Transcript of January 21, 1976 Hearing (T. 1/21), Civil Action 4780, Doc. No. 70, at 3–5; 11–12; 42.

2. Column 1, lines 15–22; Column 2, lines 61–63; File Wrapper of Molinaro patent, Civil Action 75–103, Docket No. 103, at 18–19.

3. The first phase of proceedings in the case consisted of motions by various defendants to dismiss the complaint for failure to join an indispensable party—namely Mr. Molinaro.

4. See *In re Molinaro/Catanzaro Patent Litigation*, 380 F.Supp. 794 (Jud.Pan.Mult.Lit.1974).

witnesses in light of the validity issue common to each of the litigations.[5] The Southern District of New York was chosen as transferee court because:

". . . [e]xtensive discovery has already been conducted in [an action there—*Edward T. Molinaro, et al. v. General Electric Company*, Civil Action No. 72 Civ. 2786] and a master appointed by that Court has made some tentative findings on the issue of patent validity. If the court enters a judgment that the patent is invalid, the remaining actions may be disposed of on the basis of *Blonder-Tongue v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). In any event, the familiarity of the transferee judge with the issues and discovery involving validity will enable him to tailor a pre-trial program to fit the needs of the other defendants and to process the transferred actions quickly and efficiently . . ."[6]

As it has been explained to this Court, Judge Metzner, the transferee judge, took the Multi-District Panel's suggestion, focused proceedings on the validity issue,[7] and, in particular, set down the *General Electric* case for an early trial on that issue. The potential benefits of this approach were never realized, however, because, just prior to trial, General Electric and the plaintiffs reached a settlement and disposed of the litigation by stipulation.[8]

Four days later, Civil Action No. 75–103 was filed in this Court, to be followed some two months later by Civil Action No. 75–169. The complaint in Civil Action No. 75–103, like the complaint in Civil Action No. 4780, identified instances of alleged infringement.[9] The complaint in Civil Action No. 75–169, however, was limited to general allegations of infringement and accused no specific products.[10] In each of these cases, plaintiffs filed extensive interrogatories directed to both validity and infringement issues.[11]

By early July, 1975, when Civil Action Nos. 75–103 and 75–169 were first assigned to the undersigned, the Judicial Panel on Multi-District Litigation had conditionally transferred Civil Action No. 75–103 to the Southern District of New York and there had been submitted to that Panel motions by many of the defendants in the already-consolidated actions for retransfer of their respective actions to the original transferor districts—motions opposed by the plaintiffs herein—along with a motion of the plaintiffs to transfer the entire amalgam of cases, or at least the so-called "tag-along" or "second generation" actions to the District of Delaware.[12] Among other arguments before the Judicial Panel on Multi-District Litigation was an argument by the defendants that the actions should be retransferred because one or more of the consolidated cases were ready for trial on the issue of validity.[13] Under these circumstances, a potential for wasted effort was presented which made it undesirable to push ahead with the cases before me prior to the decision of the Judicial Panel on

---

5. *In re Molinaro/Catanzaro Patent Litigation*, 380 F.Supp. at 795.

6. *In re Molinaro/Catanzaro Patent Litigation*, 380 F.Supp. at 795–96.

7. See, Affidavit of Catanzaro, Civil Action 4780, Docket No. 116 at ¶ 4.

8. Entry of April 14, 1975 in file docket of 72 Civ. 2786 (S.D.N.Y. Civil Action No. 4780), Docket No. 51.

9. See Civil Action No. 75–103, Docket No. 1, ¶ 7.

10. Civil Action No. 75–169, Docket No. 1, ¶ 7.

11. In Civil Actions 75–103 and 75–169, plaintiffs filed a basic package of 65 interrogatories. In Civil Action 4780, a total of 72 interrogatories have been pressed. See Civil Action 4780, Docket No. 56. See Civil Action No. 75–103, Docket No. 15; Civil Action No. 75–169, Docket No. 3.

12. See Opinion of the Judicial Panel on Multi-District Litigation, Docket No. 45, Civil Action 4780, at 2. The "tag-along" actions were those filed by plaintiffs too late to participate in the initial multi-district consolidation.

13. *Id.*

Multi-District Litigation. As a result, initial requests by certain of the defendants for stays of discovery were honored [14] although the defendants in Civil Action No. 75–169 were granted only limited extensions of time in which to file responsive pleadings.[15]

On October 23, 1975, the Judicial Panel on Multi-District Litigation rendered its decision. The result was that the conditional transfer orders were vacated and the various actions previously consolidated in the Southern District of New York were re-transferred to their originating districts, the latter course of action being prompted by the Judicial Panel on Multi-District Litigation's belief that "pre-trial proceedings on the common validity issue have been concluded in the transferee court. . . ." [16]

Arguing that the possibility, under the *Blonder-Tongue* doctrine,[17] that the actions before me would be mooted by a trial elsewhere on the validity issue, many of the defendants in these actions filed new motions to stay these proceedings pending the outcome of one of the re-transferred cases.[18] Plaintiffs, who represent themselves in these cases, opposed any such further stays.[19] On December 4, 1975, I ruled that defendants had failed to show that any of the "first generation" cases was suffi-

ciently near the trial stage to justify the requested stays.[20] Accordingly, I ordered defendants to file answers to plaintiffs' interrogatories or, alternatively, objections thereto.[21] I further ordered that, if objections were presented, plaintiffs and counsel for the objecting defendants should meet on December 22, pursuant to Local Rule 17, for the purpose of attempting to resolve their differences and that, to the extent such attempts at conciliation proved fruitless, I would hear argument, also on December 22nd, respecting defendants' objections.

Defendants' partial answers and objections to interrogatories were duly filed,[22] the Rule 17 conference held, and the results reported to the Court.[23] Three things immediately appeared. First, discovery in these cases promised to impose a substantial burden upon the defendants. For example, in addition to the extensive interrogatories which had been filed, plaintiffs had filed requests for production seeking not only *all* documents "referring directly or indirectly to the patent-in-suit", but also "all documents relating to 'Signal Seeking Receivers' and/or any 'automatic Signal Seeking Receivers' . . . ." [24] When some of the defendants, asserting that compliance would require a wholesale search of an imposing array of files,[25] offered to honor the requests pursuant to Rule 33(c), plaintiffs took the position that all documents should

14. See stay Orders of July 10, 1975, Civil Action 75–169, Docket No. 21; September 15, 1975, Civil Action 75–169, Docket No. 37.

15. Civil Action 75–169, Docket No. 21, ¶ 3.

16. Civil Action 5780, Docket No. 45, at 3.

17. *Blonder-Tongue Laboratories, Inc. v. Univ. of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

18. See, for example, Civil Action 75–169, Doc. Nos. 44, 45, 49. Masco argued, in the alternative, for a transfer of the action against it to the Middle District of Pennsylvania, where the case involving the Radio Shack Corporation had been re-transferred. See Civil Action 4780, Doc. No. 47.

19. In addition, plaintiffs argued that the three actions before me be consolidated for all purposes. See Civil Action 75–103, Doc. No. 48.

20. See Civil Action No. 75–169, Doc. No. 79.

21. The answers to interrogatories were ordered filed by January 9, 1976; the objections by December 15, 1975.

22. See, for example, Civil Action 75–169, Doc. Nos. 52, 54, 84–91, 107, 120, 122, 139, 143; Civil Action 75–103, Doc. Nos. 61, 62, 64, 74, 75, 76; Civil Action 4780, Doc. No. 54.

23. See generally, Transcript of Conference of December 22, 1975, Civil Action 75–103, Doc. No. 82 [T. (12/22)] at 11–65.

24. Civil Action 75–169, Doc. Nos. 71 and 3, at ¶ 2.

25. See, e. g., T. (12/22) at 32–4; Civil Action 75–169, Doc. No. 96, at 6; Civil Action 75–169, Doc. No. 97, at 3–4.

be produced at Wilmington, instead of their place of customary storage.[26]

Secondly, discovery threatened to impose a heavy burden, not only on defendants, but on the Court as well, a number of defendants indicating that there were confidentiality, attorney-client privilege, work-product privilege and governmental secrecy problems inherent in much of plaintiffs' discovery requests, and concerning which problems the parties were far from agreement.[27]

Third, it appeared that the extent of the discovery problems posed for defendants and the Court was closely related to the question of how broad a range of devices discovery should encompass. For example, counsel for defendant Magnavox stated that one possible interpretation of the definitions of those categories provided by the plaintiffs "cover almost the entire defense spectrum of any kind of defense equipment that adjusts to a signal, which is a very big area and it is a troublesome area with all government contract aspects. . . ."[28]

When counsel for other defendants agreed that the magnitude of the discovery problems was closely related to the general scope which discovery was to have,[29] it appeared that the most expeditious procedure would be to attempt to clarify for all concerned what was to be the proper scope of discovery. Accordingly, the defendants were invited to submit their views as to what range of devices discovery might appropriately encompass[30] and a hearing was scheduled for the purpose of exploring what differences there were among the parties respecting the suggestions of defendants.[31]

On January 21, 1976, the Court and the parties met and it developed from a discussion that the principal difference between most, if not all, of the defendants and the plaintiffs respecting the scope of the discovery was with respect to what the Court and the parties have come to call "termination-of-signal" devices.[32] A termination of signal device is one which resumes its tuning upon the termination of the signal being received, as opposed to one which resumes tuning after a predetermined time interval without regard to whether the signal has stayed on the air or not. Plaintiffs' position was that the Molinaro patent covers termination of signal devices[33]; all of the defendants pressing the matter, on the other hand, vigorously disputed that the Molinaro patent could even arguably bear such an interpretation.[34] It was apparent that if the defendants were correct, this would have a great practical impact on size and scope of the litigation before the Court.[35]

On February 17, 1976, having considered the matter and recognizing that the issue of the scope of the plaintiffs' patent claims had already been presented by a motion for summary judgment of invalidity which Raytheon had filed,[36] I decided it would be

**26.** T. (12/22) at 56–7.

**27.** See, e. g., T. (12/22) at 19–34.

**28.** Statement of counsel for Magnavox, T. (12/22) at 40. The fact that plaintiffs' remedy respecting devices manufactured for the United States Government would be in the Court of Claims, providing the defendants could show appropriate authorization and consent clauses, did not serve to obviate the problems as plaintiffs took the position that, notwithstanding the existence of such authorization and consent clauses, that they had the right to determine whether devices manufactured for the U. S. Government might not also have been sold commercially and/or to foreign governments. *Id.*, Statement of Mr. Catanzaro at 51.

**29.** See Statements of Counsel, T. (12/22) at 22, 39–40, 51–2, 57, 59. See also Transcript of January 21, 1976 hearing, Civil Action 4780, Doc. No. 70 [T. (1/21)] at 21–2.

**30.** *Id.* at 39–40.

**31.** Order of January 6, 1976, Civil Action 75–169, Doc. No. 116.

**32.** See generally, Transcript of January 21, 1976 hearing "[T. (1/21)]", Civil Action 4780, Doc. No. 70, at 8–22.

**33.** *Id.* at 8–11.

**34.** *Id.* 14–22.

**35.** See, e. g., *Id.*, at 21–2.

**36.** See Civil Action 75–169, Doc. No. 118.

most sensible to afford the objecting defendants an opportunity to substantiate their assertion that, as a matter of law, plaintiffs' patent could not be interpreted as broadly as plaintiffs contended.[37] Accordingly, the desired argument on such issue was ordered consolidated with the forthcoming argument on Raytheon's summary judgment motion.[38]

During this period when the Court was attempting to come to grips with the discovery problems in these cases generally, other matters had been put before the Court which, indirectly, raised discovery questions of their own. I here refer to the summary judgment motions of non-infringement which had been filed in Civil Action No. 75–169 by defendants Bendix, Rockwell and Magnavox.[39] The first of these was filed by Bendix on September 8, 1975. Originally, no supporting papers were filed with the notice of motion and, at this early stage, it seemed to the Court that plaintiffs' interrogatories on the infringement issue should be answered before any motion for summary judgment based on non-infringement should be brought on. Thus, on September 15, 1975, I wrote to the parties concerned as follows:

> The stay of discovery entered today should not prevent Bendix from pursuing its motion for summary judgment with a brief and affidavits. The Court will not, however, require the plaintiffs to brief the motion until Bendix has filed answers to all interrogatories relating to the issue of infringement. While I note Bendix's alternative suggestion in its motion, I think plaintiffs are entitled to have their interrogatories on the infringement issue answered in the manner contemplated by the rules. . . .[40]

On October 28, 1975, I reiterated this ruling, ordering all defendants wishing to pursue summary judgment motions to answer plaintiffs' infringement interrogatories.[41]

Bendix, Rockwell and Magnavox eventually all supplied answers to those of plaintiffs' 65 interrogatories squarely directed to the subject of infringement.[42] Most relevantly, each indicated whether or not they had, within the six years immediately preceding suit, manufactured, used or sold any signal-seeking or automatic-signal-seeking receivers.[43] Bendix stated that the only signal seeking receivers it had manufactured for other than the United States Government[44] consisted of a number of signal seeking automobile radios. These were identified by Bendix Model No., Product Designation, Serial Manual Part Number and by Make and Model Year of Car for which supplied.[45] In an affidavit supporting its motion for summary judgment, filed the same day as its answers to plaintiffs' infringement interrogatories, Bendix stated unequivocally that these radios functioned in a manner different from that to which the Molinaro patent lays claim, in that they did *not* resume tuning automatically, but rather had to be *manually* restarted after once locking onto a signal within the scanned spectrum.[46]

Magnavox took the same position as Bendix, stating that the only signal seeking

---

**37.** It struck me at the time that even if defendants' attempt proved fruitless, the process of exploring the scope of plaintiffs' patent would materially aid any subsequent rulings on that discovery.

**38.** See Opinion and Order of February 17, 1976, Civil Action 75–169, Doc. Nos. 161, 162.

**39.** Civil Action No. 75–169, Doc. Nos. 26, 42, 43.

**40.** Letter from Court to Parties, 9/15/75; Appendix A to this Opinion.

**41.** See Letter from the Court to the parties, October 28, 1975, Appendix B to this Opinion.

**42.** Civil Action 75–169, Doc. Nos. 52, 54, 107.

**43.** *Id.*

**44.** Bendix alleged that the devices manufactured for the United States Government were manufactured pursuant to contracts containing authorization and consent clauses.

**45.** See Bendix's answer to plaintiffs' interrogatory No. 49, Civil Action 75–169, Doc. No. 54.

**46.** Scheeler Affidavit, Civil Action 75–169, Doc. No. 66 at ¶¶ 7–8.

receivers commercially manufactured by it during the statute term [47] were certain "remote control search-tuning TV receivers", and certain "search-tune radio receivers", all of which had to be restarted *manually*.[48]

Rockwell flatly denied that it had ever, during the statute term, manufactured, used or sold signal seeking receivers or automatic signal seeking receivers *of any type*.[49]

On November 28, 1975, after Bendix and Rockwell had answered the infringement interrogatories, plaintiffs filed a "Motion Under Rule 37 To Compel Complete Answers To Plaintiffs' Interrogatories Relating To The Infringement Issue. . . ",[50] in which plaintiffs argued that the defendants should be forced to answer twelve enumerated interrogatories before being allowed to proceed with their summary judgment motions. Many of the specified interrogatories were either wholly irrelevant to the infringement issue,[51] relevant only to the issue of willfulness should infringement be proved,[52] or not reasonably calculated to unearth admissible evidence.[53] More importantly, however, after considering the record which had then been presented in support of the motions for summary judgment and the provisions of Rule 56, I concluded that reconsideration of the rulings of September 15th and October 28th was in order. Accordingly, on December 9, 1975, I wrote to the parties that:

> I think the Court's statement in its October 28, 1975 letter is too broad in scope if literally read. Now that Bendix has filed affidavits and briefs in support of its motion, I think it is entitled to have plaintiffs respond to that motion either by way of an affidavit pursuant to Federal Rule of Civil Procedure 56(f) or by way of a brief directed to the merits of the summary judgment issue. . . . If, as suggested by their November 28 paper, plaintiffs intend to take the position that they should not be required to respond to the motion on its merits until further discovery is conducted, they should file an affidavit pursuant to Rule 56(f). . . In addition to the information called for in Rule 56(f), plaintiffs shall state in the affidavit whether or not they contend that any of the products referred to in Bendix's answer to Interrogatory No. 49 and its brief infringe the patent (and if so, which ones). . . .

These rulings were memorialized in an Order of the same date.[54]

Plaintiffs failed to comply with the Court's Order, but rather filed a letter [55] and a motion in which they stated:

> Plaintiffs are of the belief that, due to the Court's earlier ruling and directives contained in letters of September 15, 1975 and October 28, 1975, the lawful rationale of this case has been established and should not now be circumvented to allow the defendants Bendix, Rockwell, and/or others an advantage in instant activity *until* the directives have been fully carried out in accordance to (sic) case history. . . .[56]

In order to insure that plaintiffs' failure to comply had not resulted from a layman's misunderstanding of either the substance,

---

47. Magnavox asserted that it had received authorization and consent clauses respecting all signal seeking receivers and automatic signal seeking receivers manufactured for the United States Government. Doc. No. 107, Civil Action 75–169, at 2.

48. Magnavox's answer to Interrogatory No. 49 and affidavits of Louis Mayle (¶ ¶ 12–15) and Jackie Lantz (¶ ¶ 9–12), Doc. No. 107.

49. Doc. No. 47, Affidavit of R. J. Crawford, at ¶ 8; Doc. No. 52, Answer to Plaintiffs Interrogatory No. 49.

50. Civil Action 75–169, Doc. No. 72.

51. E. g., 54, 56.

52. E. g., 3.

53. E. g., 2, 6, 36.

54. Civil Action 75–169, Doc. No. 81.

55. See plaintiffs' letter to the Court of December 11, 1975.

56. Affidavit of plaintiff Catanzaro, Civil Action 75–169, Doc. No. 95.

or significance, of this Court's ruling and Order of December 9, 1975, the Court advised plaintiffs at the December 22, 1975 discovery hearing of the deficiencies in their response.[57] Among other things, plaintiffs were advised that they had no absolute right to discovery [58] and that, in order to oppose the summary judgment motions then before the Court through the vehicle of Rule 56(f), it would be necessary for them to submit affidavits stating sound reasons why they should be allowed to insist on further discovery.[59] Plaintiffs were further advised that the Court would enter an order delineating exactly what they must do in order to successfully invoke Rule 56(f).[60]

On December 29, 1975, an order was entered reminding plaintiffs that they had not taken any position respecting the automobile radio devices disclosed by Bendix and had not otherwise submitted an adequate Rule 56(f) affidavit, and stating that:

> The Court is unable to reach a fair and just determination of plaintiffs' application to stay proceedings on the motions for summary judgment pending further discovery without being further advised regarding plaintiffs' position with respect to the disclosed devices, the reasons why plaintiffs are unable to present facts by affidavit to justify their opposition to Bendix's and Rockwell's motions, and what, if any, information they currently possess which suggests that Bendix and Rockwell have infringed the patent-in-suit. The Court considers this information essential in order to determine whether the defendants should be put to the burden of any further discovery and, if so, what should be the appropriate area or areas of that discovery. . . .[61]

On January 6, 1976, a comparable order was entered respecting Magnavox's summary judgment motion.[62]

Plaintiffs ultimately filed two affidavits which in part merely reiterated the conclusory infringement allegations of their complaint and, in other part, stated as follows:

> Plaintiffs aver, upon information and belief, the U. S. Government, the government of Israel, along with possibly one or more of each of the following governments: West Germany; GREAT BRITIAN; AUSTRALIA; JAPAN; and IRAN, were believed supplied equipments by the defendants Bendix and Rockwell which embrace the subject matter of plaintiffs' patent. Other Foreign Governments may have also been involved in the defendants' ECM (Electronic Counter-Measures) market. . . .[63]

> Plaintiffs aver, upon information and belief, that the United States Government, the government of Israel, and possibly many other foreign governments were supplied equipments by defendant Magnavox which embraced the subject matter of plaintiffs' patent. . . .[64]

Ostensibly in support of these allegations, plaintiffs cited as instances of infringement eleven *generic* categories of military devices and fourteen individual military devices. So far as generic categories were concerned, Bendix, for example, was alleged to be making, using or selling infringing "ECM (Electronic Countermeasures Equipment identified in AVIATION WEEK & SPACE TECHNOLOGY, Marketing Directory, Page 94. . . .); NAVIGATION AIDS, Radio, Ground, Ship-Based [p. 5, same magazine]; ELECTRONIC SCRAMBLERS [p. 194]; SCANNERS, HORIZON [p. 121]. . . .".[65] Magnavox was said to

---

**57.** See Transcript of Hearing, Civil Action 75–103, Doc. No. 82, at 66, *et seq.*

**58.** *Id.*, at 74.

**59.** *Id.*, at 72–74.

**60.** *Id.*, at 79–80.

**61.** Order of 29 December, 1975, Civil Action 75–169, Doc. No. 108, at ¶ 7.

**62.** Civil Action 75–169, Doc. No. 116.

**63.** Plaintiffs' affidavit, Doc. No. 112, at ¶ 3.

**64.** Plaintiffs' affidavit, Civil Action 75–169, Doc. No. 127.

**65.** Civil Action 75–169, Doc. No. 112, at 4.

be making, using or selling "the following specific apparatus which is identified in AVIATION WEEK & SPACE TECHNOLOGY, 1970 MARKETING DIRECTORY ISSUE. . . . ECM equipment, Command Sys. & Equipment, Infrared Equipment . . . Navigation Receivers, Radar Equipment, Airborne, Ground & Ship-based. . . ."[66]

In response, defendants filed affidavits which, *inter alia*, stated that the devices specifically identified were not even signal seeking receivers.[67]

At the January 21, 1976 hearing, plaintiffs were asked to explain how they arrived at the conclusion that the defendants were infringing their patent. They pointed to a magazine called AVIATION WEEK AND SPACE TECHNOLOGY, the December 28, 1970 Marketing Directory Issue of which, plaintiffs pointed out, lists the defendants as manufacturers of the accused *generic* types of military devices.[68] Plaintiffs stated, either at the hearing or in contention papers, that certain other magazine articles, most notably "NEW SYSTEM AUGMENTS B–52 ECM CAPABILITY"[69] coupled with Mr. Molinaro's "knowledge of electronics dating back to 1948", led them to believe that "the defendants moving for summary judgment of non-infringement could not actively engage in the areas pointed out . . . without making, us-

ing, and/or selling equipment which could function in a receiving mode of operation responsive to a received signal and then restart its tuning or sensing operation *as a result of a 'termination of signal'* or its equivalent. . . ."[70]

On February 17, 1976, on the record thus presented, I ruled that:

"With respect to the area of commercial manufacture, use and sale, the affidavits before the Court indicate that (1) plaintiffs have *no* information whatever which would suggest that defendants [Bendix, Rockwell and Magnavox] have infringed in the area of commercial production, (2) plaintiffs can point to no reason why they have not discovered some indication of infringement in the commercial area over the period of at least six years defendants are alleged to have infringed and common sense would suggest that such information would have been and is readily available in the market place, if infringement has occurred, and (3) qualified affiants have sworn that no infringement has occurred. The Court can only conclude from this record that plaintiffs, insofar as they claim infringement in this area, have asserted and prosecuted their claims against these defendants without any substantial justification. While Rule 56(f) is to be liberally construed to prevent injustice to a party faced with a summary judgment motion, it is also de-

**66.** Civil Action 75–169, Doc. No. 127, at 2.

**67.** Civil Action 75–169, Doc. Nos. 130, 145, 151, 156. The only exception to these blanket denials were with respect to devices designated in paragraph 5, sections 4–8 of plaintiffs' affidavit in opposition to Magnavox's motion. Doc. No. 127. National security was said to preclude comment on these devices and Magnavox submitted sworn statements that the devices, whatever their nature, were manufactured solely for the United States Government pursuant to contracts containing authorization and consent clauses. First and Second Robertson affidavits, Doc. Nos. 107, 145, Civil Action No. 75–169.

**68.** See Appendix A to this Opinion.

**69.** AVIATION WEEK AND SPACE TECHNOLOGY, Issue of February 7, 1966. Appendix B to this Opinion.

**70.** Affidavit of Edward T. Molinaro, Civil Action 75–169, Doc. No. 141. (emphasis supplied). The countries alleged to be the beneficiaries of defendants' infringing activities were evidently gleaned from another AVIATION WEEK AND SPACE TECHNOLOGY article, "Strong ECM Market Found Abroad", appearing in the October 19, 1970 Issue. See Appendix C to this Opinion. The magazine articles heretofore noted are the only ones which have been supplied to the Court in response to its directives that plaintiffs state everything they were aware of which suggested infringement. No other materials were cited by plaintiffs when they were subsequently confronted with a motion for counsel fees on the ground *inter alia*, that they had commenced these actions in bad faith. Civil Action 4780, Doc. No. 118, appended exhibits.

signed to enable a court to avoid abuse of the discovery process, and necessarily assumes that there will be cases where the Court, in the exercise of its discretion, may deny the application for further discovery. *Donofrio v. Camp,* 152 U.S.App.D.C. 280, 470 F.2d 428 (Cir. 1972); 10 Wright & Miller, *Federal Practice & Procedure* § 2741. I believe this is such a case insofar as it relates to the area of commercial manufacture, use and sale by these three defendants. Further discovery in this area will be denied."[71] Respecting the manufacture, use or sale for foreign governments, I was disposed, at least for the time being, to afford plaintiffs the benefit of the doubt:

The record with respect to the area of manufacture, use and sale of military equipment for foreign governments presents a somewhat different question. It is reasonable to credit plaintiffs' assertion that information in this area is not readily available to them save through discovery of the defendants. While it is not so easy to credit plaintiffs' assertion that Bendix, Rockwell and Magnavox cannot be active in the manufacture of any of eleven broad categories of military equipment without infringing the patent-in-suit, I am not, as yet at least, prepared to hold that the patent-in-suit could not reasonably be expected to have application at least in the field of electronic counter-measures equipment or that plaintiffs do not believe, in good faith, that it is being so applied. Given the handicap of the holder of a patent having application in the military equipment field when he attempts to police his patent, it seems to me that a complete bar to discovery in the area of military equipment for foreign nations would be inappropriate at the present time. This conclusion does not, however, require the Court to permit unlimited discovery of these defendants. The Court's obligation

under Rule 56(f) is to enter an order which is "just" under the circumstances and I cannot ignore the fact that plaintiffs' basis for believing infringement has occurred in this area is tenuous. In order to assist the Court in entering a "just" order, these three defendants . . . are invited to propose some form of discovery which will provide some reasonable assurance that infringement has not occurred in the area of manufacture, use and sale of military equipment for foreign governments.[72]

Alternatively, the respective defendants were offered the option of holding their summary judgment motions in abeyance pending the determination of the "termination-of-signal" issue posed by the contention that discovery be limited, and by Raytheon's summary judgment motion. The rationale for this option was plaintiffs' own limitation in the Molinaro affidavit quoted above, of the area of alleged infringement involving foreign governments to termination-of-signal devices.[73]

## II. BENDIX'S MOTION FOR SUMMARY JUDGMENT

After the Opinion and Order of February 17, defendants Rockwell and Magnavox elected to stay their summary judgment motions pending the resolution of the termination-of-signal issue.[74] Bendix, however, decided to press forward and to that end submitted a proposal that "Bendix . . . make available for a deposition pursuant to Rule 30 an employee having personal knowledge in the area of manufacture, use and sale of military equipment for foreign governments. . . ."[75] In a subsequently submitted affidavit, Bendix represented that it:

". . . maintain[ed] International Marketing Operation [IMO] with its main offices at 1633 Broadway, New York,

---

**71.** Opinion of February 17, 1976, Civil Action 75–169, Doc. No. 161, at 10.

**72.** *Id.,* at 11–12 (footnotes omitted).

**73.** Affidavit of Edward T. Molinaro, Civil Action 75–169, Doc. No. 141, at ¶ 1.

**74.** Civil Action 75–169, Doc. Nos. 174, 175.

**75.** Civil Action 75–169, Doc. No. 171.

New York. Bendix's IMO does not manufacture any products itself. The function of IMO is to arrange for the sale of and sell products made by Bendix's operating divisions to customers in foreign countries. In particular, any and all manufacture, use or sale in military equipment by Bendix for foreign governments is arranged by and handled through IMO. . . . Bendix has in its employ at its IMO New York City offices a qualified engineer having personal knowledge of the technology of any and all military equipment made, used or sold by Bendix for foreign governments. . . ."[76]

After soliciting plaintiffs' views regarding this discovery proposal,[77] the Court ruled that "Bendix's discovery proposal [was], in principle, acceptable and Bendix's summary judgment motion [would] not be stayed pending the resolution of the issues to be presented to the Court on May 21, 1976. . . ."[78] and ordered that "plaintiffs shall within seven days of their receipt of this Order file with the Court and serve upon Bendix a statement indicating whether or not they intend to depose Bendix's engineer. . . ."[79]

Plaintiffs, thereafter, consistently avoided directly stating their position respecting, or availing themselves of, the opportunity afforded by Bendix's discovery proposal. First, they interposed a raft of objections to the proposal, most of them frivolous,[80] along with a request that the deposition be conducted in accordance with Rule 30(b)(4).[81] Eventually, after granting plaintiffs' Rule 30(b)(4) request, this Court ordered plaintiffs to "file and serve a written election . . . to take Bendix's deposition as soon as convenient, but in no event later than May 21, 1976 or . . . to not take Bendix's deposition. . . ."[82]

Once again, plaintiffs attempted to evade a clear directive. On May 4, 1976, they noticed depositions of William L. Miron, President-Group Operations of Bendix,[83] and Mr. William C. Purple, President-Aerospace Electronics Group of Bendix.[84] In response, Bendix sought a protective order and submitted sworn statements that neither Mr. Miron nor Mr. Purple, in contrast to the proffered engineer, "[had] personal knowledge of the technology of military equipment manufactured, sold or used by Bendix for foreign governments nor . . . personal knowledge of what specific military equipment was manufactured, sold or used by Bendix for foreign governments. . . ."[85] The Court vacated the depositions notice under the authority of Rule 26(c) as well as that of Rule 56.[86]

Despite this Court's instruction, at the May 21, 1976 argument, that it did not consider the noticing of Mr. Miron's and Mr. Purple's depositions to constitute a proper election under the Court's Order of April 30th,[87] and despite this Court's assurance to plaintiffs that they *would not be limited* to deposing the proffered engineer should they be able to show that he was not knowledge-

---

76. Civil Action 75–169, Doc. No. 198, ¶¶ 3, 4.

77. Civil ACtion 75–169, Doc. No. 178.

78. Civil Action 75–169, Doc. No. 180, ¶ 1 of Order.

79. *Id.* ¶ 4.

80. See Civil Action 75–169, Doc. Nos. 178, 184.

81. *Id.*

82. Civil Action 75–169, Doc. No. 186.

83. In an affidavit submitted in support of a motion for protective order, Bendix stated that Mr. Miron was "one of the three highest executives reporting directly to the President and Chief Executive Officer of the Corporation. . . ." Civil Action 75–169, Doc. No. 198, ¶ 5.

84. In the same affidavit, Mr. Purple is described as "the highest executive of a group of divisions and operations which combined and do about one-third of all Bendix's business. . . ." *Id.* ¶ 6.

85. *Id.*, ¶¶ 5, 7.

86. Civil Action 75–169, Doc. No. 199.

87. See transcript of argument, May 21, 1976, Civil Action 4780, Doc. No. 99, at 91.

able in the areas claimed,[88] plaintiffs, with full knowledge that failure to depose the proffered engineer meant that they would get no further discovery from Bendix prior to this Court's ruling on Bendix's summary judgment motion, insisted on their "right" to depose whomever they chose.[89]

Turning to the merits of Bendix's motion, I note that the party moving for summary judgment has the burden of establishing that "there is no genuine issue as to any material fact and that [he] is entitled to judgment as a matter of law. . . ."[90] It is also true, however, that:

> When a motion for summary judgment is made and supported, as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.[91]

In the present case, so far as commercial manufacture, use or sale is concerned, Bendix has submitted affidavits identifying the signal seeking receivers they have manufactured and explaining that none resume scanning automatically (on termination of signal, expiration of a predetermined time period, or otherwise).[92] Plaintiffs have never, despite two court orders specifically directing them to do so, stated their position respecting the identified commercial devices. Nor have plaintiffs ever identified any other Bendix devices which they claim infringe the patent-in-suit. Nor have they offered any explanation, satisfactory or otherwise, why they are unable to present

such information. Indeed, the only relevant statement respecting this aspect of Bendix's motion which plaintiffs have yet made was Mr. Catanzaro's concession that a device must possess some type of automatic restart in order to infringe.[93] Accordingly, there is no dispute, genuine or otherwise, regarding any material fact and Bendix is entitled to summary judgment, so far as commercial devices are concerned.

Respecting devices manufactured, used or sold for the United States Government, Bendix has submitted sworn statements that any signal seeking receivers it may have supplied to the United States Government were supplied pursuant to contracts containing appropriate authorization and consent clauses and plaintiffs, after inspecting the relevant documents, have agreed that, as to any such devices, their sole remedy is against the United States Government in the Court of Claims.[94] *Stelma, Inc. v. Bridge Electronics Company*, 300 F.2d 761 (3rd Cir. 1962).

Finally, plaintiffs have, as touched upon previously, submitted affidavits making certain assertions about Bendix's activity respecting the supplying of military equipment to foreign governments. The principal affidavit asserts that Bendix manufactures four specific pieces of military equipment, and four generic types of military devices (Electronic Counter Measures equipment, and three other types) which infringe the patent-in-suit.[95] The authority for plaintiffs' belief that Bendix manufactures the *generic* types of equipment referred to is, as noted earlier, a December 28, 1970 issue of AVIATION WEEK AND SPACE TECHNOLOGY which lists Bendix as a manufacturer of these types of devices.

---

**88.** *Id.*, at 90, 93, 94. See also Civil Action 75–169, Doc. No. 180, ¶ 1.

**89.** Transcript of argument, May 21, 1976, Civil Action 4780, Doc. No. 99, at 94–5. On May 27, 1976, the Court entered an order foreclosing plaintiffs from further discovery. Civil Action 75–169, Doc. No. 212.

**90.** F.R.C.P. 56(c).

**91.** F.R.C.P. 56(e).

**92.** See Civil Action 75–169, Doc. Nos. 56–70, particularly Scheuler Affidavit, Doc. No. 66.

**93.** See transcript of January 21, 1976 conference, [T.($\frac{1}{21}$)], Civil Action 4780, Doc. No. 70, at 13.

**94.** T. January 21 at 43–4.

**95.** Civil Action 75–169, Doc. No. 112, at ¶ 4 of appended affidavit.

The sources for plaintiffs' asserted belief that Bendix's Electronic Counter Measures equipment constitutes or contains infringing devices are said to be Mr. Molinaro's "knowledge of electronics dating back to 1948" and a magazine article, written by a Barry Miller, describing one piece of equipment manufactured by an unrelated concern.[96]

No source for plaintiffs' asserted belief that the Navigation Aides, Electronic Scramblers or Horizon Scanners produced by Bendix constitute infringing products is anywhere set forth.

Regarding the four specific alleged infringing pieces of equipment, plaintiffs do not say how they came to the conclusion that Bendix manufactured such devices. Nor do they anywhere specify the basis for their asserted belief that such devices infringe their patent. Pressed by the Court at the January 21, 1976 conference for an explanation, Mr. Catanzaro stated, with respect to the AN/FPS–85, that the accusation of infringement was based on the type of device it was:

> MR. CATANZARO: It is a system, Your Honor, which utilizes a communication-type apparatus which we believed functions in the manner set forth by the claims. It's as simple as that, Your Honor.
>
> THE COURT: I mean, what has given you that information? You didn't just wake up some morning and say, Oh,

AN/FPS–85 infringes my patent! You must have looked at something or seen something or seen a product or seen a specification or seen a magazine or something.

> MR. CATANZARO: It's a surveillance-type piece of equipment, Your Honor. The AN/FPS–85 is a surveillance type piece of equipment. It is a receiver which seeks, searches and receives apparatus, and in our knowledge of communications-type equipment we know that they cannot be part of this system, the defendant's product cannot be part of this system, without infringing the plaintiffs' patent. We have information about communications-type of apparatus which falls into this category. . . .[97]

None of the asserted information has ever been supplied.

Bendix, for its part, replied to plaintiffs' affidavits with its own affidavits. These were statements of Bendix employees, based on personal knowledge and on familiarity with Bendix's operations. In these affidavits, Bendix flatly denied that the four itemized devices infringed the patent, or that they even contained any signal seeking receivers![98] So far as the accused *generic* types of equipment were concerned, a representative from each Bendix division listed in the marketing issue of *AWST* as a manufacturer of such devices, swore upon personal knowledge that such devices either did not include signal seeking receivers or were manufactured for the United States

---

**96.** Plaintiffs reliance on this article is at best curious. The particular piece of equipment, known as "ALR–20 Counter Measures Receiver" is manufactured by the Electronic Specialties Company, Los Angeles, a concern not suggested to be related to any of the defendants. Moreover, and very importantly, the passages referenced by plaintiffs (see the "checkpoints" isolated in Civil Action 4780, Doc. No. 118, p. 20 of appended article) contain no indication that the ALR–20, let alone electronic counter measure devices in general, restart scanning upon termination of signal. Indeed, the ALR–20 is described as sweeping its frequency band at 60 cycles per second and one searches in vain for any indication that the ALR–20 even stops on an encountered signal, other than manually. Also somewhat curiously, if Mr. Molinaro's subsequent affidavit is to be be-

lieved, the ALR–20 is not an infringing device because it is a "TRF Receiver (tuned radio frequency) and, therefore, cannot be used with AFC (Automatic Frequency Control) as is [sic] all the receivers to which the Molinaro Patent-In-Suit is directed to." Affidavit of Edward T. Molinaro, Civil Action 75–169, Doc. No. 181, at ¶ 4. See discussion at Section III, *infra*.

**97.** Transcript of January 21, 1976 conference, Civil Action 4780, Doc. No. 70, at 49.

**98.** See Affidavits of Messrs. Yates, Cole, McMullen, Civil Action 75–169, Doc. Nos. 149, 150, 151. The AN/FPS–85, for example, was stated to be a "phased array radar system" and was represented to include "no signal seeking receiver". Doc. No. 151, ¶ ¶ 8, 9.

Government under contracts containing appropriate authorization and consent clauses.[99]

On this record, I believe Bendix is entitled to summary judgment respecting alleged infringement in the foreign government area. Its affidavits conform with Rule 56(e); plaintiffs do not supply any competent evidence which creates a dispute of material fact.[100] It is true that at an earlier stage, I held that plaintiffs were entitled to rely on Rule 56(e) in view of the lack of publicly available information respecting military devices. But, as has already been noted, when an opportunity to delve further into Bendix's foreign operations was afforded, plaintiffs deliberately refused to take advantage of it.[101] Thus, any reliance at this time on Rule 56(f) is misplaced and Rule 56(e) governs this case. Since the uncontradicted Bendix affidavits establish that Bendix does not infringe the patent-in-suit, Bendix is entitled to judgment.[102]

### III. SCOPE OF THE MOLINARO PATENT

In contrast to Bendix, defendants Rockwell and Magnavox elected to hold their motions for summary judgment in abeyance pending a decision on the scope of the Molinaro patent—i. e., on the so-called "ISSUE No. 1" framed in the Court's February 17, 1976 Opinion.[103] This issue was then briefed and, in conjunction with Raytheon's motion for summary judgment, argued to the Court.[104]

As has been already pointed out, plaintiffs' claim that the Molinaro patent covers two types of automatic signal seeking receivers—those which restart scanning after a pre-arranged duration of pause [hereafter sometimes "time interval devices"] and those which restart upon the termination of the signal being received [hereafter sometimes "termination of signal devices"]. At least for discovery purposes, none of the defendants dispute that the Molinaro patent may be construed to cover the time interval type of device; defendants argue strenuously, however, that the Molinaro patent may not reasonably be construed to cover termination of signal devices. Plaintiffs, in turn, have taken the position that there is one claim (although *only* one claim) which can be so interpreted—that being Claim 3 of the patent.[105] Moreover, to be precise, it is plaintiffs' contention that

99. Civil Action 75–169, Doc. Nos. 146–151, 156.

100. In the context of the record established in the Bendix affidavits, I do not believe that any genuine dispute of material fact is created by Mr. Molinaro's conclusory statement that no one can be active in the electronics measures field or in a number of other broad areas without infringing his patent. This is particularly true where the only specific "example of such inference" cited in a magazine article which does not even arguably support that inference. See Fn. 69, supra, p. 424. Moreover, nothing in this record demonstrates Mr. Molinaro's competence to draw the "inference" which he does. The following statement, found in an affidavit filed in connection with Raytheon's motion for summary judgment, constitutes the entire record on Mr. Molinaro's qualifications: "I have been continuously active in the field of Electronics for a period in excess of the last twenty years. For a period of the last ten years, I have been employed at Weston Instruments, Archbald, Pennsylvania, as an electronic technician. (Excluding a period of approximately two years that I was laid off due to a reduction in work force at Weston)." Civil Action 75–169, Doc. No. 181, at 1.

101. In addition to having waived their right to pursue discovery under Rule 56(f), plaintiffs are also not entitled to further discovery in that area as a result of this Court's determination, immediately *infra,* that plaintiffs' patent cannot be reasonably interpreted as encompassing "termination-of-signal devices". As noted before, plaintiffs' asserted basis for suspecting infringement in the foreign government area was limited to such devices.

102. F.R.Civ.P. Rule 56(e).

103. Civil Action 75–169, Doc. Nos. 174, 175.

104. See Transcript of Argument, May 21, 1976 [hereafter T. (5/21)], Civil Action 4780, Doc. No. 99.

105. See, for example, plaintiffs' "Scope" paper, Civil Action 4780, Doc. No. 87 atl; Molinaro affidavit Civil Action 75–169, Doc. No. 181, ¶ 21; Plaintiffs' Reply Memo, Civil Action 4780, Doc. No. 110, at 2, ¶ 6; Plaintiffs' "Scope" Rebuttal, Civil Action 4780, Doc. No. 93, at 5. See, for example, Civil Action 75–169, Doc. No. 181, at 13; Civil Action 4780, Doc. No. 87, at 1.

Claim 3 covers only those devices whose restarting is limited to termination of signal.

Before proceeding to evaluate the parties' respective contentions, the question whether the scope of plaintiffs' patent is presently ripe for judicial determination must be examined. Plaintiffs, pointing to their demand for a jury trial, and asserting that there are triable issues of fact respecting the scope issue, argue that the Court must stay its hand. Defendants, in reply, assert that the interpretation of a patent poses a question of law *simpliciter* and, thus, a summary disposition is warranted. Although I believe defendants' argument to be somewhat overbroadly stated, I agree that the interpretation issue in this case may and should be decided at this stage.

■ First, as defendants point out, a demand for a jury trial does not *ipso facto* foreclose a summary judgment where that remedy is otherwise appropriate.[106] Secondly, it appears well settled that the question of interpretation of a patent claim is one of law,[107] and thus ultimately for the Court.[108] Of course, decision on any legal question presupposes a stratum of fact on which to operate. In the case of claims interpretation, however, the relevant materials are the claims themselves, the patent specification and drawings, and the history of the patent's prosecution in the Patent Office (the so-called "file wrapper"),[109] all of which are presently in the record and concerning the substance (as opposed to the interpretation) of which there is no dispute.[110]

■ Of course, as plaintiffs point out, patents are directed toward those skilled in the art[111] and thus there are cases where expert testimony is either desirable or necessary for a court to properly grasp the significance of the claims, specification and file wrapper, or at least of terms used therein.[112] In the present case, however, the claims of the patent are worded functionally, and those portions of the specification and file wrapper critical to a resolution of this controversy are likewise in functional, rather than structural, form. Accordingly, although as the patent-in-suit deals with electronic apparatus, no understanding of circuitry or other technical matters is required for a resolution of the controversy

**106.** See, e. g., *Tights, Inc. v. Stanley,* 441 F.2d 336, 339–40 (4th Cir. 1971); *In re Georgia Jewelers, Inc.,* 219 F.Supp. 386, 399 (N.D.Ga.1962).

**107.** See, e. g., *Methode Electronics, Inc. v. Elco Corporation,* 385 F.2d 139, 140 (3rd Cir. 1967); *New Wrinkle, Inc. v. John Armitage & Company,* 277 F.2d 409, 412 (3rd Cir. 1960); *Zaidan v. Borg-Warner Corporation,* 281 F.Supp. 72, 75 (E.D.Pa.1968); 4 *Deller's Walker on Patents* § 230 (2nd Ed. 1965) and cases cited therein.

**108.** See, for example, *Panther Pumps & Equipment Company v. Hydrocraft, Inc.,* 468 F.2d 225, 227 (7th Cir. 1972); *Methode Electronics, Inc. v. Elco Corporation, supra,* 385 F.2d at 139.

**109.** *Graham v. John Deere Company,* 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Westinghouse Elec. Corp. v. Hanovia Chemical & Manufacturing Company,* 179 F.2d 293, 296–97 (3rd Cir. 1949); *Bullard Company v. General Electric Company,* 349 F.2d 985, 989 (4th Cir. 1965).

**110.** At oral argument, plaintiffs suggested that their patent claims were to be construed in light of the prior art. T. (5/21) at 13. The authority they cite in support of this proposition is wholly inapposite, however. Moreover, as I understand the law, whether a patented invention is a "pioneer" one or a "secondary" one bears on the question of the type and number of devices which may be held to infringe, rather than on the question of just what has been patented in the first place. See 4 *Dellers Walker on Patents* § 244 (2nd Ed. 1965) and cases cited therein.

**111.** *Briggs v. M & J Diesel Locomotive Filter Corporation,* 342 F.2d 573, 578 (7th Cir. 1965); *Tokyo Shibaura Elec. Co. v. Zenith Radio Corp.,* 404 F.Supp. 547, 557 (D.Del.1975).

**112.** On the other hand, the mere incantation of the skilled artisan standard is insufficient to avoid summary judgment where the terms of the claims, when read in the context of the specifications, are clear, *cf., e. g., Duplan Corporation v. Deering Milliken, Inc., supra,* 370 F.Supp. at 772, or where the incantation of this standard is not accompanied by some reasonably plausible explanation of why the skilled artisan would read the patent as it is alleged he would. Compare, e. g., *Powerlock Floors, Inc. v. Rollins,* 280 F.Supp. 627, 630 (D.Del.1968); *Zaidan v. Borg-Warner Corp., supra,* 281 F.Supp. at 75–76.

between the parties. Moreover, there are no technical terms whose meanings have been placed in dispute by conflicting expert affidavits.[113] In short, I am convinced that the record here demonstrates that there is absolutely no need for expert testimony to resolve the issue posed, and, accordingly, I now turn to the merits of the interpretation issue.[114]

A patent is a contract between the patentee and the public (as represented by the Patent Office), and is to be interpreted according to the intent of the parties striking the agreement.[115] As has been noted, the materials from which the patentee's intent may be derived are the claims themselves, the accompanying specification, and the "file wrapper".[116]

We begin, of course, with the language of the claims. Claim 1 is broadly worded and reads as follows:

> In a signal-seeking receiver, power-operated means for tuning said receiver successively to signals within a frequency range of operation, means responsive to a received signal for stopping said tuning means, means to effect automatic restarting of said tuning means *after a predetermined short time interval,* whereby the tuning of the receiver proceeds automatically from signal-to-signal but stops for a short interval on each signal to permit the user to decide whether he desires that signal, and means operable by the user to prevent the automatic restarting of said tuning means whenever the user desires that the receiver shall remain tuned to a signal then being received.[117]

In other claims of the patent, the language corresponding to the second and third "means" clauses in the foregoing appears as follows:

*Claim 2*

. . . [m]eans responsive to a received signal for stopping said tuning means, said last means including a relay . . . means to effect automatic reenergization of said relay *after a predetermined short time interval* following each signal-responsive deenergization of the relay. . . .

*Claim 4*

. . . [a] relay operatively associated with said tuning means . . . means responsive to a received signal for deenergizing said relay to stop said tuning means, means automatically effective to reenergize said relay restart said tuning means *after a predetermined short time interval* following each stoppage of the tuning means. . . .

*Claim 7*

. . . [a] relay operatively associated with said tuning means . . . means rendered effective by deenergization of said relay to initiate a timing interval of predetermined short duration and to ef-

---

113. Compare *Ethyl Corporation v. Borden, Inc.,* 427 F.2d 206 (3rd Cir. 1970).

114. The demonstrated lack of need for expert testimony renders a summary judgment disposition appropriate. See, for example, *Borden Company v. Clearfield Cheese Company,* 369 F.2d 96, 101 (3rd Cir. 1966); *Zaidan v. Borg-Warner Corporation, supra,* 281 F.Supp. at 75.

115. See *I.T.S. Rubber Company v. Essex Rubber Company,* 272 U.S. 429, 442, 47 S.Ct. 136, 71 L.Ed. 335 (1926); *Laitram Corp. v. Deepsouth Packing Co.,* 443 F.2d 928, 933 (5th Cir. 1971); *Strong-Scott Manufacturing Company v. Weller,* 112 F.2d 389, 394 (8th Cir. 1940); 4 *Deller's Walker on Patents* § 225 (2nd Ed. 1965) and cases cited therein.

116. Plaintiffs have repeatedly asserted that Mr. Molinaro's intent, at the time he obtained this patent was, above all, to claim termination of

signal devices, and they have even made reference to an "earlier drawing" which allegedly supports one of plaintiffs' assertions regarding the interpretation of the patent. T. (5/21) at 31. Plaintiffs have cited no authority, however, nor have I uncovered any, which would suggest that any such evidence, either tangible or oral, would be admissible on the question of interpretation of the Molinaro patent claims. This is in keeping with the principle underlying 35 U.S.C. § 112, that the public is entitled to fair notice of what field of endeavor has been monopolized by virtue of a patent. See, e. g., *General Elec. Co. v. Wabash Co.,* 304 U.S. 364, 368–69, 58 S.Ct. 899, 82 L.Ed. 1402 (1938); *Norton Co. v. Bendix Corp.,* 449 F.2d 553, 555 (2d Cir. 1971).

117. Emphasis supplied.

fect automatic reenergization of said relay *at the expiration of said interval.*[118]

Defendants concede that, in light of the cited passages from the various claims, the Molinaro patent does arguably cover those signal seeking receivers which automatically resume scanning after a pre-arranged duration of pause—i. e., time interval devices.

That brings us to Claim 3, which appears in the patent as follows:

> In a signal seeking receiver, power-operated means for tuning said receiver successively to signals within a frequency range of operation, means responsive to a received signal for temporarily stopping the operation of said tuning means *during a predetermined short time interval* whereby the tuning of the receiver proceeds automatically from signal-to-signal but stops for a short interval on each signal to permit the user to decide whether he desires that signal, and means operable by the user for interrupting the automatic signal-to-signal tuning whenever the user desires that the receiver shall remain tuned to a signal then being received.

This claim, it will be noted, does not anywhere expressly mention a function of automatically restarting the scan upon termination of the signal being received. Moreover, as defendants point out, if the word "during" is read in the sense of "for", the claim language accurately describes a time interval device, the "predetermined short time interval" representing the duration of pause on an acquired signal.

Plaintiffs contend, however, that the patentee's use of the phrase "*during* a predetermined short time interval" as opposed to "*after* a predetermined short time interval" or its equivalent,[119] reflects the patentee's intent to cover termination of signal devices, and that a skilled artisan would so read the language of Claim 3. Plaintiffs' position is completely implausible, however.

To begin with, if the "time interval" referred to in the underlined language of Claim 3 refers as it seems clearly intended to have been,[120] to the duration of the pause on an acquired signal, the qualifying adjectives "predetermined" and "short" foreclose any interpretation of the underlined language which would have the time interval being controlled by events external to the patented invention, as would be the case with a termination-of-signal device. While plaintiffs do assert, to be sure, that the "predetermined short time interval" does not refer to the duration of pause on signal, their suggestion on various occasions as to what the interval in fact is are both inconsistent and farfetched in the context of the claim under consideration.

Thus, in a deposition taken February 24, 1975, plaintiff Catanzaro stated that the interval referred to the "time that the carrier wave is being transmitted".[121] Later, Mr. Molinaro intimated in an affidavit that the "time interval" was the interval (determined by the time delay relay tube of figure 2) during which the Molinaro device would pause, if it were not being used with "short" duration signals.[122] At oral argument, the plaintiffs seemingly provided yet a third suggestion:

> THE COURT: I wish you would help me a little more. Could you tell me again—and I realize you have already spoken to this but just help me again—as to what is intended by the words "during a predetermined short interval"? Could you give me an example of what you are talking about?
>
> MR. MOLINARO: * * *

**118.** Claims 5 and 6 are worded dependantly on Claim 4.

**119.** *I. e.,* "at the expiration of [such] interval". Civil Action 4780, Doc. No. 93, at 6, ¶ 4(c).

**120.** The "predetermined short time interval" referred to in the analogous clauses of other claims plainly refers to the duration of pause on signal and the "short interval" referred to in the "whereby" clause of Claim 3.

**121.** Civil Action 75–169, Doc. No. 192, at A–14.

**122.** Civil Action 75–103, Doc. No. 107 at ¶¶ 4–5.

The predetermined short time interval is an interval of time where, if you operate at a certain band of frequencies, these transmissions will end in a short time. In other words, in a short time the receiver will start scanning. That is all that is meant. If you were to design the receiver in a broadcast band, it wouldn't do that. So you design a receiver in a band of frequencies where it is predetermined that they will terminate in a short time.

. . .

THE COURT: Well, can you give me an example?

MR. MOLINARO: An example is the defendants' equipment. . . . [123]

Secondly, if the underlined language of Claim 3 were read as covering termination-of-signal devices, the entire second half of the claim:

. . . whereby the tuning of the receiver proceeds automatically from signal-to-signal but stops for a short interval on each signal *to permit the user to decide whether he desires that signal,* and means operable by the user for interrupting the automatic signal-to-signal tuning whenever the user desires that the receiver shall *remain tuned to a signal then being received.*

would be rendered inane and/or superfluous. The stated purpose of stopping on the signal (specified in the "whereby" clause [124]) is to permit the user to decide whether he desires that signal; if the device is going to stay on the signal until it terminates in any event, however, there is nothing to decide and the "means operable . . . for interrupting the signal-to-signal tuning" serves no purpose, or, stated otherwise, serves to keep the tuning mechanism stopped on a signal which has gone off the air.[125] In light of these facts, plaintiffs' argument is at once improbable and in conflict with the principle of patent construction that all parts of claims are to be given effect, if possible. 4 *Deller's Walker on Patents* § 225 at 67, n. 4 (2d Ed. 1965).

As can be seen, then, there is no express mention of termination of signal restart in Claim 3 and there is, in fact, language in that claim and other claims of the patent-in-suit which indicates that coverage of termination-of-signal devices was never intended. Even if we assume *arguendo,* however, that there is some ambiguity in the second means clause of Claim 3, a review of the specification makes it even clearer that coverage of termination-of-signal operation was never intended by patentee Molinaro.

The title of the patent is "Station *Sampling* Radio",[126] and the stated objects of the invention are: "to provide a signal seeking radio having means for scanning

---

**123.** T. (5/21) at 28. For other instances where plaintiffs discuss the "predetermined", "short" time interval, see Civil Action 75–103, Doc. No. 108; T. (5/21) at 24.

**124.** The "whereby" clause, it should be noted, is the *same* in *all* claims of the patent, including those which presumably cover time interval devices. Plaintiffs assert that the clause does have a different meaning from claim to claim, Civil Action 4780, Doc. No. 114, Appendix H, at 101, but there is nothing in either the claims, specification, or file wrapper to alert the reader to such a fluctuating meaning.

**125.** Mr. Molinaro retorts that, so far as he is concerned, "signal" means that "two people are talking" and, therefore, the purpose of stopping on the "signal" is to hear the other side of a two-way conversation. T. (5/21) at 26. This argument amounts, although plaintiffs deny it, to an assertion that the word "signal" should be interpreted, not as a reference to the *signal* being received, but rather to

the *frequency* upon which the signal is received. The short answer is that the word "signal" is used over and over again in the claims and specifications to mean the signal itself and nothing in Claim 3 suggests that it is being used in any other sense. For example, the words "whenever the user desires that the receiver shall remained tuned to a *signal* then being received" appear in all of the claims, including those which plaintiffs maintain are directed to time interval devices. In this context, the only possible intent, is a reference to the signal itself.

**126.** File Wrapper of Molinaro Patent, Civil Action 75–103, Doc. No. 103 at 1 (emphasis added). Webster's New World Dictionary, Second College Edition, defines "sampling" as the process of "tak[ing] a sample or samples. . . ." .and defines a "sample" as a "part, piece or item taken or shown as representative of a whole thing, group, species, etc. . . .".

the radio dial to automatically tune in on the next station of the dial, *remain tuned on that station for a predetermined period of time and to then automatically tune in on the next subsequent station of the dial*" and " . . . to provide a signal seeking radio of the above type in which the tuner will automatically tune in on each station of the dial, *pausing briefly at each station* to permit the listener to determine whether that station is to be listened to, and to then proceed to the next station, automatically, additional means being provided whereby the tuning can be selectively halted so as to maintain the radio in tuned position at any particular station."

Immediately following the stated objects of the invention, the patent specification discusses an electronic circuit, said to be illustrated in Figure 1 of the patent drawings. This discussion states that, when the radio [127] is not tuned to a station, there is "*no negative voltage* on the grid 23 of the tube 22",[128] the effect of which is, through the action of a relay to "*commence the movement of the pointer to scan the dial*".[129] "As a station is encountered", the specification says, "[a certain] *voltage is applied . . . across the grid resistor 21* of the control tube 22",[130] and this again through the action of a relay, "*open[s] the motor circuit, which stops the tuning means and allows the station to be heard.*"[131] At the same time, again through action of a relay, a "charged condenser B [is connected] which will *maintain negative voltage on the grid 23* until it leaks off ten seconds later through the resistor 21.[132] (An alternative condenser, condenser A, described as "having twice the capacity as that of condenser B", is provided. If condenser A is chosen by a switch, it "would then hold each sta-

tion for twenty seconds instead of ten seconds as referred to with condenser B".[133] Following this, "*negative voltage* is no longer on the grid of the tube . . . This [again by the action of a relay] *will energize the motor* and allow the *next* station to be heard or *sampled* for the ten second period, following which the cycle is started again . . . ."[134]

The deviation from this pattern occurs as follows:

"When the listener hears a station that he desires to hold, he can do so by pressing [a] switch . . . which will [cause] the relay 11 to open the contacts 13, 14, *stopping the tuning means* and allowing the station to be heard."[135]

Significantly,

"[a]fter listening to this station, the switch may be closed to *operate the tuning motor* and cause the *sampling* operation to be repeated. . . ."[136]

One need not know how this circuitry functions to say that the quoted language teaches a device which—as the result of some interaction between a certain grid voltage, a relay and a motor—starts tuning when there is no signal, stops tuning when there is a signal, and repeatedly restarts tuning ten or twenty seconds after the signals are first encountered. Furthermore, it appears that this repeated stopping on acquired signals for ten or twenty seconds is what is meant by the term "sampling".

The Molinaro patent specification goes on to describe a second circuit, this one said to be illustrated in Figure 2 of the patent drawings. This circuit is stated to be "*substantially the same as that described in connection with Figure 1, except that a ten second (the number of seconds can be var-

---

127. Without explanation, the term "radio" is used throughout the specification and the phrase "signal seeking receiver" is used throughout the claims.

128. Molinaro Patent, Col. 1, lines 55–56.

129. *Id.,* Col. 1, lines 56–59.

130. *Id.,* Col. 1, lines 61–64.

131. *Id.,* Col. 1, lines 64–68.

132. *Id.,* Cols. 1 & 2, lines 71–2; 1–2.

133. *Id.,* Col. 2, lines 2–7.

134. *Id.,* Col. 2, lines 7–14.

135. *Id.,* Col. 2, lines 17–21.

136. *Id.,* Col. 2, lines 22–24.

ied . . . ) time delay relay tube . . is used in place of condensers A, B, *to select each station for ten seconds.*"[137] The operation of this circuit is then briefly set forth as follows:

> As a station is encountered, *the automatic volume control voltage at 20 is applied to the grid 23 . . . causing deenergization of relay 11. Thus, the tuning motor 16 runs until the voltage at 20 is applied.* At the same time [that the motor circuit is opened] (certain contacts) close the ten second time delay relay tube 51 circuit, *which will ten seconds later through its built in contacts . . . again close the motor circuit starting the scanning cycle all over again.*[138]

Next, as in the case of the first circuit, a method for stopping the tuning "when the listener hears a station he desires to hear" is described, the mechanism in question being said to:

> [s]to[p] the tuning means and hol[d] the station until the next *sampling* operation is to be started. . . .[139]

Except for two succeeding boiler-plate paragraphs, the foregoing contains a fair summary of the *entire* Molinaro patent specification. As is evident, there is abundant evidence in the specification indicating that Mr. Molinaro intended to obtain a patent on time interval devices. As can also be seen, however, the patentee nowhere mentions any termination of signal function, either in terms or in any equivalent language, and one struggles in vain to find *any* passage, which by *any* construction, attempts to convey the termination-of-signal concept.

Plaintiffs, however, assert that the specification does teach termination of signal—in two respects. First, plaintiffs state that

"[i]n looking at the words of the specification at line 54, column 1, it so states: 'it is assumed that as the radio was turned on *it was not* tuned to a station, therefore no negative voltage was on the grid 23 of tube 22' etc. Accordingly, *what is taught* by the latter is that *there is no signal* in this instance (or the signal has terminated, or, more preferred, 'termination of signal') . . . and thus the 'ASSR' will (quoting again from the specification of the patent, line 58, column 1) 'commence the movement of . . . scan' (line 59) accordingly."[140]

This is pure sophistry. The cited passage of the specification is clearly directed to the question of how the receiver will operate *if there is no signal being received when* it is first turned on. The passage is clearly not directed to the question of how the receiver will function if a signal is being received and then terminates.

Secondly, plaintiffs state that a skilled artisan would realize that termination of signal operation could be achieved by utilizing the circuitry disclosed in Figure 2 under such conditions that one of the circuit components (the time delay relay tube) would be superfluous and inoperative.[141] The relevant question, however, is not what a skilled artisan would realize *could* be done, utilizing the technology disclosed as a starting point, but what sorts of structures he would believe the patent monopoly covered. Surely a skilled artisan would not be quick to assume that one of the principal claimed functions of an electronic apparatus was one wherein part of the circuitry was useless,[142] and there is nothing in either the claims specification or file wrapper to alert a skilled artisan that such an unlikely result was intended.

---

137. *Id.,* Col. 2, lines 30–36 (emphasis added).

138. *Id.,* Col. 2, lines 36–48 (emphasis added).

139. *Id.,* Col. 2, lines 50–59.

140. Civil Action 4780, Doc. No. 93, at 5, ¶ 2.

141. See, for example, Civil Action 75–103, Doc. No. 107, at 4–5 ¶ 4.

142. This is especially so because the circuit in which the superfluous part appears (Figure 2) is described as being "substantially the same" as the circuit of Figure 1—which is not claimed to have any superfluous parts—and since, in particular, it is expressly stated in the specification (Col. 2, lines 32–36) that the allegedly superfluous part plays a role in the circuit of Figure 2 analogous to that played by certain presumably nonsuperfluous parts in Figure 1.

In short, it is clear that the Molinaro patent specification cannot reasonably be read as supportive of plaintiffs' interpretation of Claim 3 of the patent.[143]

Turning to the file wrapper, one discovers that the claims allowed to Mr. Molinaro were not the original claims filed with the patent office. Initially, six claims were filed, the sole independent one of which stated as follows:[144]

In a signal seeking radio having means for sequentially scanning a radio dial and consecutively tuning to radio stations thereon, automatic temporary circuit holding means for interrupting said scanning of said dial *for a predetermined period of time* and manual switch means for interrupting said scanning of said dial independently of said automatic temporary holding means.[145]

Each of the six original claims were rejected by the Patent Examiner, for a variety of reasons, many relating to form. Claims 1 and 2 were also rejected, however, in light of Gull "Presettable Signal Seeking Tuning System", U.S. Pat. No. 2,572,926 (October 30, 1951). In explaining this rejection, the Patent Examiner stated "[t]he stop-on-tune automobile receiver of the reference will stay tuned to a previously captured station until the vehicle goes beyond the range of the station, and the entire set may be turned off at its volume control knob, thereby making the search means inoperative. . . ."[146]

Subsequent to this rejection, Mr. Molinaro submitted the claims eventually allowed. Accompanying the amended claims were a number of so-called "Remarks" in which, *inter alia,* the following was stated:

While applicant does not acquiesce in the rejection of the original claims, it is believed that applicant's receiver can be *better defined* and for this reason new claims . . . have been inserted in lieu of the original claims which have been cancelled.

In this application, applicant discloses a novel signal-seeking receiver in which the signal-seeking tuning proceeds automatically from signal-to-signal but stops for a short time interval on each signal to permit the user to decide whether he desires that signal, . . .

In the conventional signal-seeking receiver, the signal-seeking tuning stops on each signal, and unless the user happens to desire the first signal on which the tuning stops, he is required to manually restart the signal-seeking action, and he is required to do this repeatedly until the receiver is tuned to a signal to his liking.

On the other hand, in applicant's signal-seeking receiver, once the signal-seeking tuning is started it continues from signal-to-signal throughout the entire frequency range of operation, stopping momentarily on each signal *for* a predetermined short time interval to permit the user to decide whether he desires the particular signal then being received.

. . .

*The new claims* presented herein *clearly* define applicant's receiver. . . .[147]

As can be seen, the original independent claim spoke of "interrupting said scanning of said dial *for* a predetermined period of time". As can also be seen, in explaining in his "Remarks" the crux of his invention, Mr. Molinaro clearly discussed the time in-

---

**143.** It is noteworthy that even if the termination of signal concept were clearly articulated in the patent claim, the total failure to teach it in the specification would itself be fatal to plaintiffs' patent. 35 U.S.C. § 112; Patent Office Rule 75(d)(1), 37 C.F.R. § 1.75(d)(1). In this regard and, particularly, respecting plaintiffs' argument about Figure 2, it has been held that disclosure in a drawing only, without antecedent basis in the language of the specification, is an insufficient "teaching". *Permutit Co. v. Graver Corp.,* 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163 (1931).

**144.** Claim 6 was totally meaningless and was disallowed by the Patent Office as being "informal".

**145.** Molinaro Patent, Civil Action 75–103, Doc. No. 103, at 6 (emphasis added).

**146.** Civil Action 75–103, Doc. No. 103, at 10.

**147.** *Id.,* at 18–20 (emphasis supplied).

terval type of automatic restart—making several references to "stopping", or "stopping momentarily", on each signal *for* short time intervals—but made absolutely no reference, in terms or otherwise, to termination of signal operation. Given that the stated purpose of the amended claims and the accompanying remarks was to "better define" the Molinaro receiver, I find the affirmative discussion of time interval restart and the absence of any discussion of termination of signal restart to be highly persuasive evidence that, at the time he applied for his patent, Mr. Molinaro had no intent to claim termination of signal operation.[148]

In short, after review of the language of the claims, the specification, and the file wrapper, I find that there is abundant support for the defendants' position and none whatsoever for plaintiffs' rather tortured construction of the controverted language of Claim 3. I have considered all the arguments advanced by plaintiffs in addition to those already discussed and have found them unpersuasive.[149] They fail to raise any question that summary judgment is inappropriate here and, in particular, they fail to point out how any expert testimony could possibly alter the result here reached.[150]

This litigation, I am convinced, presents the case of an *ex post facto* attempt to stretch certain claim language, like a "nose of wax",[151] to cover a subject matter which was simply not taught in plaintiffs' patent. There is thus no justification for allowing these cases to go forward with a scope that far exceeds the limited area in which plaintiffs' claims of infringement may possibly have merit. Accordingly, an order will be entered (1) recording this Court's conclusion, as a matter of law, that the claims of the patent-in-suit cannot be read to cover termination of signal devices, and (2) directing that further proceedings be held to determine the question of whether plaintiffs' claims with respect to time interval signal-seeking receivers are valid and infringed.[152]

**148.** A patentee's contemporaneous appraisal of his invention is entitled to weight in determining how a patent is to be interpreted. *Sclnitzer v. Calif. Corrugated Culvert Co.,* 140 F.2d 275, 276–77 (9th Cir. 1944); *Modern Products Supply Co. v. Drachenbunz,* 152 F.2d 203, 207 (6th Cir. 1943), *cert. denied,* 321 U.S. 806, 66 S.Ct. 964, 90 L.Ed. 1030 (1946); compare *Jack Winter, Inc. v. Koratron Co.,* 375 F.Supp. 1, 24–25 (N.D.Cal.1974).

**149.** One of plaintiffs' main lines of argument consists of a pastiche of phrases snatched from various court opinions; thus, "each claim of a patent is in theory a separate patent" and "a patentee can be his own lexicographer". See, e. g., Civil Action 4780, Doc. No. 87, at 1; Civil Action 4780, Doc. No. 110, at 2. I have read the cases cited by plaintiffs and, suffice it to say, they do not stand for the proposition that claims, or any parts thereof, are to be interpreted without regard to their context or that words may be assigned unusual meanings without there being any support for the meaning in the claims, specifications or file wrapper. Another of plaintiffs' arguments consists in the clearly erroneous suggestion that, so long as a patentee is willing to risk anticipation in the prior art, he may assign *any* meaning he chooses to a claim. See, e. g., Civil Action 4780, Doc. No. 87 at 1; Civil Action 75–169, Doc. No. 181 at 13; Transcript of July 16, 1976 Argument, Civil Action 75–169, Doc. No. 232 at 71. Plaintiffs also argue that the controverted language in Claim 3, being phrased in terms of "means", captures a broad range of devices. We are faced here, however, not with a question of whether a certain mechanism (means) is covered by the patent, but rather with the question of what *mode of operation* (result) is claimed by the patent.

**150.** I have also carefully reviewed plaintiffs' "Questions of Fact Ascertained", Civil Action 75–103, Doc. No. 110. For the most part the statements made in this document are pure argumentation; in any event, I found nothing in the document to suggest there was any *genuine* issue of fact present here.

**151.** See *White v. Dunbar,* 119 U.S. 47, 51–52, 7 S.Ct. 72, 30 L.Ed. 303 (1886).

**152.** Plaintiffs have referred the Court to three discovery rulings in other related cases which may be inconsistent with the result here reached. See Letter of Magistrate Goettel, March 25, 1975, Exhibit 2 to Plaintiffs' Petition for Mandamus of March 17, 1976 (Appendix D to this Opinion); Order of Judge Becker, June 8, 1976 and Letter of Judge Fisher, July 6, 1976, Exhibits A and B to Civil Action 4780, Doc. No. 116.

The documents which reflect these rulings do not reflect the reasoning upon which they are based. They do, however suggest that none of these rulings were made with the kind of

## IV. MASCO'S MOTION FOR SUMMARY JUDGMENT

Subsequent to this Court's Opinion of February 17, 1976, defendant Masco, in Civil Action No. 4780, filed a motion for summary judgment of non-infringement.[153] As noted above, plaintiffs' complaint against Masco specified three devices as infringing—the "Bearcat", "Pinto" and "Jolly Roger" models. Masco, in a sworn affidavit, based on the personal knowledge of the relevant division's chief electrical engineer,[154] has stated that the three accused product lines are the *only* signal seeking receivers it has ever manufactured and that these receivers do not function in such a way as to be covered by the Molinaro patent. In particular, it is stated:

" . . . in the operation of the accused . . . signal seeking radio receivers, a predetermined number (typically eight) of discrete, preselected frequencies or channels in one or more frequency bands is electronically tuned or scanned sequentially. Each channel corresponding to the frequency of a particular transmitting station is determined by a preselected crystal and tuning is accomplished by electronically switching from one crystal to another. The switching proceeds sequentially, electronically switching from one frequency to another. The switching proceeds sequentially from channel to channel until a received signal is detected on a particular channel, and switching then stops and the receiver remains tuned to or locked on that particular channel *until the signal terminates,* however long that may be. *Upon termi-*

*nation of the signal, switching resumes* and continues until another signal is received on another channel (or again on the same channel). . . . "[155]

In short, Masco's signal seeking receivers are sworn to be pure termination of signal devices. If these assertions be accepted as true, my ruling in Section III immediately preceding is thus dispositive of Masco's motion.

As has already been noted, Rule 56(e) dictates that "[once] a motion for summary judgment is made and supported as provided . . . an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. . . . " In the present case, plaintiff Catanzaro has failed to present any facts which even remotely suggest that there is a genuine issue for trial. He makes no claim, for example, that Masco manufactures, uses or sells any devices for the United States or any foreign government; he presents no facts suggesting that any devices other than the Bearcat, Pinto and Jolly Roger lines infringe the patent-in-suit; and he presents no facts whatsoever to suggest that the Bearcat, Pinto and Jolly Roger models which, according to his own exhibits, are commercially available, function otherwise than as claimed.[156]

What Mr. Catanzaro does present is a barrage of objections[157] which likewise fail to create any genuine issue.[158] Mr. Catanzaro suggests, for example, that the affida-

---

record before the Court which has been presented here. The parties before me, recognizing that failure to narrow these cases to the arguable issues will impose a substantial and wholly unnecessary burden, have developed a record upon which the outer perimeter of the patent claims can confidently be established.

153. Civil Action 4780, Doc. No. 103.

154. Actually, the devices are manufactured by a division of a wholly-owned subsidiary of the defendant in this case, Masco Corporation of Delaware. Affidavit of Cecil Mathis, Appendix A to Masco's brief, Civil Action 4780, Doc. No. 89.

155. *Id.,* ¶ 4 (emphasis supplied).

156. See Civil Action 4780, Doc. No. 110, Exh. 5.

157. See "Plaintiffs' Reply," Civil Action 4780, Doc. No. 110 and papers cited therein; "Post-Argument Recap", Civil Action 4780, Doc. No. 117.

158. Many of the objections are directed to the issue of the scope of plaintiffs' patent, and, to the extent worthy of comment, have been treated in Section III immediately preceding.

vit of Masco's electrical engineer be discounted because that engineer formerly worked for a concern whom Messrs. Catanzaro and Molinaro had approached about a license for the patent-in-suit.[159] Mr. Catanzaro also states, in an affidavit, the "[d]efendant's equipment, contrary to any remarks in his brief, do have the means to function in its frequency determining operation, to stop responsive to a received signal; they are communications type receivers; and such operation of stopping its operation is of a *short* and *temporary* function and quite understandably, are not operational on long periods of time or permanent time duration while in automatic mode of operation. . . ." [160] When the Court attempted to clarify this assertion during oral argument, the following colloquy occurred:

THE COURT: As far as the devices that have been disclosed in this record you do not suggest by paragraph 9(b) that you have reason to believe that these devices will not remain stopped on a signal until the signal terminates?

MR. CATANZARO: Your Honor, I can't answer that question until we have had an opportunity to analyze all of the relevant information associated with the operational techniques of the receivers. So I can't answer that question.

\* \* \* \* \* \*

THE COURT: What do you mean when you say, short temporary function, of a short temporary function?

MR. CATANZARO: Well, Your Honor, in communications-receivers, if you had that operation in operation at this particular time, you will find that the communications broadcast are of such duration and the stoppage is temporary. In contrast to what the attorney, Mr. Gust, has

said, it is on for the duration of the signal. It is still a temporary portion of broadcast. And this is what is specific to this type of communications. It has the ability, in accordance with the claim, to temporarily stop, only temporarily stop, not permanently stop, because as I read "permanently" and as we hope the jury will understand "permanently", "permanently" being something that is indefinite. . . . [161]

I find it apparent from this exchange that Mr. Catanzaro's affidavit assertion amounts to no more than an observation that, in the circumstances in which Masco's devices are likely to be used, the length of the pause on a given signal is not likely to be long. There is here, however, no denial that Masco's receivers are termination of signal devices.[162]

Mr. Catanzaro asserts in his affidavit [163] that two of J. C. Penney's (the vendor of the Pinto model) answers to interrogatories given May 1, 1973, in a related action in the Middle District of Pennsylvania, foreclose summary judgment here, the interrogatories referred to being as follows:

*Interrogatory No. 26.* Does the Pinto scanning receiver have the ability or means operable by the user for interrupting the automatic frequency to frequency scanning, whenever the user desires that the receiver shall remain locked on a frequency?

*Answer:* Yes.

*Interrogatory No. 27.* Does the Pinto scanning receiver have the ability to automatically scan from frequency to frequency, stop responsive to a received signal on the given frequency and further have the ability of locking to said stopped on frequency permanently by the user if

---

159. Civil Action 4780, Doc. No. 110, appendix affidavit of Catanzaro at ¶¶ 1–7.

160. Civil Action 4780, Doc. No. 110, appendix affidavit of plaintiff Catanzaro, at ¶ 9(b).

161. Transcript of July 16, 1976 [T. 7/16] Argument, Civil Action 75–169, Doc. No. 232 at 40–42.

162. Masco's devices are described as such in an article which Catanzaro himself introduced. Civil Action 4780, Doc. No. 110, Appended Exh. 4. Indeed, when it has suited his purpose, plaintiff Catanzaro has expressly claimed that Masco's are termination-of-signal devices. *Id.,* p. 2; Civil Action 4780, Doc. No. 95, ¶ 8.

163. Civil Action 4780, Doc. 110, at ¶ 12.

he so desires? (Interrogatory is directed to these three steps in combination)

*Answer:* Yes.[164]

While these answers certainly appear to concede that the Pinto contains some sort of user-activated restart override, one searches in vain for any statements, let alone concessions, that the Pinto is anything other than a termination-of-signal device.

In summary, with respect to plaintiffs' infringement claim against Masco, (1) plaintiffs' complaint accused three specific commercial devices, the functioning of which can readily be ascertained by a visit to Penney's or other similar vendors, (2) Masco responded with a motion for summary judgment supported by affidavits of competent witnesses detailing the manner in which each accused device functions and how the operation of each differs from the claims of the patent-in-suit, and (3) plaintiffs countered with a number of arguments which do not contradict the substance of the Masco affidavits and, despite their education and re-education in this case concerning the purposes and the requirements of Rules 56(e) and (f),[165] did not state by affidavit or otherwise, any reason why they cannot "present . . . facts essential to justify . . . [their] opposition" to Masco's motion.

 Plaintiffs brought their infringement claim against Masco almost three years ago. Masco has now demonstrated convincingly that there is no just reason why it should have to proceed further. Summary judgment based on a finding of noninfringement is accordingly appropriate.[166]

## V. HONEYWELL'S MOTION FOR SUMMARY JUDGMENT

Also before the Court is Honeywell's motion for summary judgment of non-infringement in Civil Action No. 75–169.[167] This motion was originally supported with a set of affidavits,[168] the keystone being that of Dr. Van W. Bearinger, the corporate Vice President/Science and Engineering of Honeywell. In his affidavit, Dr. Bearinger asserted that, during the statutory period, he occupied positions within Honeywell which required that "[he] be familiar with the type of development conducted and type of products made, used and sold by each division and center of Honeywell, Inc.", and further asserted that he was, in fact, "informed as to such type of development activities and products". Dr. Bearinger went on to deny that Honeywell had, during the statutory period, manufactured, used or sold any signal seeking receivers embodying any of the combinations of elements which would infringe the Molinaro patent. Dr. Bearinger concluded his affidavit with a complete listing of the "divisions and centers of Honeywell, Inc. . . . most likely to manufacture, use or sell products [of the type covered by the Molinaro patent]." The remainder of Honeywell's affidavits consisted of statements by responsible officials of the various identified divisions and centers, stating that the particular Honeywell entity had not, during the statutory period, manufactured, used or sold any devices embodying any of the combinations of elements which would infringe the Molinaro patent.[169]

---

**164.** *Id.,* Appended Exh. 5.

**165.** My Order setting a schedule on Masco's summary judgment motion specifically advised plaintiffs that, as in the case of Bendix's Rockwell's and Magnavox's motions, the vehicle of Rule 56(f) was available to them. Civil Action 4780, Doc. No. 97.

**166.** In part, Mr. Catanzaro argues that then Magistrate Goettel's ruling that discovery respecting termination of signal devices is appropriate in this action is binding on this Court as the "law of the case". As noted earlier, see footnote 152, *supra,* there is nothing to indicate

that Magistrate Goettel had the benefit of the type of record which has been presented here and I do not believe the "law of the case" doctrine precludes a court from subsequently rectifying an erroneous discovery decision.

**167.** Civil Action 75–169, Doc. No. 135.

**168.** Civil Action 75–169, Doc. No. 160.

**169.** Included in Honeywell's application for summary judgment was a request for attorney's fees, the latter being based on Honeywell's assertion that the suit against it was

Plaintiffs' complaint in Civil Action 75–169, as already noted, cited no specific instances of alleged infringement respecting any of the named defendants.[170] Thus, as in the case of defendants Bendix, Rockwell and Magnavox, the Court included the following provision in its Order respecting plaintiffs' response to Honeywell's summary judgment motion:

Should [plaintiffs'] response take the form of a request for a stay pending further discovery, plaintiffs are ordered to supply the Court with whatever information they currently have in their possession which would indicate that Honeywell has infringed their patent and to state the reasons why they cannot present by affidavit(s) facts essential to justify their opposition to Honeywell's motion.[171]

In response to this directive, plaintiffs identified only one Honeywell product as an allegedly infringing device—that being a so-called Honeywell EMI system 7899.[172] Plaintiffs also filed a document entitled "Affidavit of Plaintiffs Molinaro and Catanzaro Pursuant to F.R.C.P. Rule 56(f)".[173] This affidavit stated that Honeywell's motion was "premature" and that plaintiffs desired to take deposition testimony. This affidavit also asserted that this discovery was "vitally needed of this defendant" and, charitably read, appeared to suggest that other sources were not available to plaintiffs. I have decided to read it in this manner in light of the fact that the record does not otherwise suggest that information regarding the operation of Honeywell's EMI 7899 system is readily available to plaintiffs from a source other than its manufacturer.

Honeywell subsequently filed an affidavit of Jack O. McCorkle, Operations Manager of the Anapolis Operation Aerospace Division of Honeywell, which stated that:

I am personally familiar with certain previously discontinued signal analysis and display equipment designated as the Honeywell Model 7899 Automatic Signal Analysis and Display System;

I am not aware of any other Honeywell product identified by numerals "7899", and do not believe that there is or has been any such other Honeywell product;

The principal purpose of said Honeywell Model 7899 System was to automatically record, on an XY plotter, signal strength as a function of frequency, and to that end the System included continuously scanning receivers;

Said Honeywell Model 7899 System did not comprise or include a signal-seeking receiver, and specifically did not include any "means responsive to a received signal for temporarily stopping operation" of a tuning means;

Said Honeywell Model 7899 System did not operate so as to automatically stop on signals within a frequency range of operation;

\* \* \* \* \* \*

No Honeywell Model 7899 System was manufactured for the U.S. Government or any foreign government.[174]

At the July 16, 1976 oral argument on Honeywell's motion, Mr. Catanzaro candidly conceded that plaintiffs' "haven't any facts to support . . . [their] contention" [175] that EMI 7899 infringed the Molinaro patent, but asserted the belief, based on undisclosed trade literature,[176] that it did infringe and stressed that the McCorkle affidavit did not provide sufficient detail about the device to enable plaintiffs to determine its capabilities.

---

launched and maintained without any reasonable basis. See Civil Action 75–169, Doc. No. 159, at 13–16.

**170.** Civil Action 75–169, Doc. No. 1.

**171.** Civil Action 75–169, Doc. No. 168, ¶ 2 of Order.

**172.** Civil Action 75–169, Doc. No. 211, ¶ 7.

**173.** Civil Action 75–169, Doc. No. 211.

**174.** Civil Action 75–169, Doc. No. 221, appendix affidavit, ¶¶ 6–10, 13.

**175.** Transcript of July 16, 1976 Hearing, Civil Action 75–169, Doc. No. 232 [T. (7/16)], at 72.

**176.** *Id.,* at 68; see also *Id.,* at 72.

A week after the argument, Honeywell produced a manual which appears to describe in detail the EMI 7899's function and operation.[177] This manual was not filed pursuant to a preestablished schedule and plaintiffs have not heretofore been directed to comment on it.

With the record in this state, I am not prepared to rule on Honeywell's motion for summary judgment or plaintiffs' application under Rule 56(f). It may be that plaintiffs should be entitled to some discovery regarding the EMI 7899 System before the summary judgment motion is determined. I will decide whether this is so after plaintiffs have had the opportunity to comment on the manuals and to specify why they need additional discovery, if they do.

█ It is clear to me at this point, however, that plaintiffs are not entitled to any discovery with respect to signal seeking receivers manufactured for, or sold solely to, the United States or foreign governments. The record establishes that plaintiffs' suspicion of infringement in these areas is predicated upon their contention that the patent is applicable to termination of signal devices.[178] As the Court has previously found this position to be untenable, these areas are beyond the scope of plaintiffs' case against Honeywell.

## VI. RAYTHEON'S MOTION FOR SUMMARY JUDGMENT

Raytheon, as earlier noted, has moved for a summary judgment on grounds of invalidity. In light of plaintiffs' contentions that the Molinaro patent covers two types of devices, this motion has been couched in the alternative.[179] Submitted are four prior art patents, two of which are said to invalidate the Molinaro patent, if and as interpreted to cover termination of signal devices, and two of which are said to invalidate the patent, as interpreted to cover devices restarting after an elapsed time interval.[180] Given my ruling in Section III respecting the scope of the patent, I will consider only those arguments based on the latter two patents.

Before discussing the issues posed by these prior art references, I note plaintiffs' position, similar to its position respecting the interpretation of the patent's claims, that the issues involved here are not amenable to summary disposition.[181] As noted in Section III, *supra,* however, neither a demand for a jury trial, nor the bald assertion that there are triable issues, forecloses summary judgment if the moving party succeeds in demonstrating that there is no *genuine* issue for trial. On the record before me, however, I conclude that Raytheon has not carried its burden. "Kulikowski, et al.". "Automatic Tuning Mechanism", U.S. Patent No. 2,745,016, May 8, 1956, is asserted by Raytheon to disclose an automatic signal-seeking receiver which "reduces by 90% the scan speed when a signal is received" and "restarts full speed scanning at the end of the signal." [182] Such a "slow-down" type of operation is common, according to Raytheon [183], and plaintiffs interestingly do not contest that such operation may be deemed a "stopping" within the meaning of the Molinaro patent claims.[184] Raytheon's affidavits concede, however, that Kulikowski does not disclose a user

---

**177.** Civil Action 75–169, Doc. No. 229.

**178.** Affidavit of Plaintiff Molinaro, Civil Action 75–169, Doc. No. 141 at 1–2.

**179.** See Transcript of Argument, May 21, 1976, Civil Action 4780, Doc. No. 99 [hereinafter T. (5/21)] at 36–37.

**180.** *Id.*

**181.** See, for example, Civil Action 75–169, Doc. No. 181, ¶¶ 18–20; Civil Action 75–169, Doc. No. 179 at p. 2.

**182.** Kadin Affidavit, Civil Action 75–169, Doc. No. 128A at 4, ¶ 9.

**183.** Polishuk Affidavit, Civil Action 75–169, Doc. No. 128A at 12, ¶ 15.

**184.** Mr. Catanzaro did assert at argument that the Kulikowski device was not a "signal-seeking receiver". T. (5/21) at 76. The assertion that the Kulikowski device is not a signal-seeking receiver has no support in the record, however, and Mr. Catanzaro's remarks following that just referenced are quite frankly unintelligible.

override [185] and I am without a record basis for concluding that incorporation of such a device would have been obvious to one skilled in the art at the relevant point in time.

"Chaveau", "Automatic Radioelectric Standby Device", U.S. Patent No. 1,932,925 (October 31, 1933) states the objective of the invention as follows:

"The present invention has for its object to provide an automatic radio-electric standby device producing a continuous variation of the elements of the receiving oscillatory circuit, the variation being effected uninterruptedly so long as a signal of sufficient force to actuate an electric relay is not received *but the variation being suspended for a predetermined period of time when a signal of sufficient strength is received*." [186]

Claim 1 of Chaveau reads:

In a radio-electric signal receiver, an oscillating circuit comprising at least one variable element, means to impress on said variable element a continuous motion, *means to automatically stop said motion during a predetermined period of time in response to the receipt of a signal in the circuit,* means to again set said element in motion when said signal is of other than a predetermined configuration, and means for stopping the motion when the signal corresponds to said predetermined configuration. [187]

As I read plaintiffs' position papers, they do not deny that Chaveau at least attempts to teach time interval automatic restart. There are several problems with Raytheon's reliance on Chaveau, however.

First, Raytheon's affidavits have left me uncertain as to whether the invention, as disclosed, is operative and whether, if not, it would be obvious how to make it operative. [188] In any event, Raytheon's reliance on Chaveau is problematical because of what I shall call plaintiffs' "improvements" argument. Plaintiffs assert that the phrase "signal seeking receiver" in each of the claims of the patent-in-suit would be read by one skilled in the art as incorporating certain advances in the signal seeking field constituting the state-of-the-art at the time of the Molinaro invention. [189] For that reason, plaintiffs are contending that all of the prior art relied upon by Raytheon, including Chaveau, is deficient. [190]

Plaintiffs are generally somewhat vague on the exact number and character of these "improvements", and the only "improvement" clearly asserted to be missing in Chaveau is Automatic Frequency Central (AFC). [191] Raytheon's approach to this "improvements" argument, so far as the Chaveau reference is concerned, is to concede *arguendo* that the expression "signal seeking receiver" in the Molinaro patent claims would be interpreted by a skilled artisan as incorporating the concept of AFC. Raytheon then asserts, however, that it would have been obvious to a skilled artisan at the time of the Molinaro invention that the circuitry which Chaveau attempted to teach could be combined with a state-of-the-art signal seeking receiver having AFC to obtain the time interval automatic restart feature in such a modern receiver. Plaintiffs deny, however, that this combination would have been obvious, and a thorough canvas of the record convinces me that I do not

---

185. Kadin & Polishuk Affs., Civil Action 75–169, Doc. No. 128A, at 4, ¶ 9, and at 11, ¶ 12.

186. Civil Action 75–169, Doc. No. 128A at 41 (emphasis added).

187. *Id.* at 44 (emphasis added).

188. Mr. Molinaro's assertion at oral argument that turning the relay around will not make Chaveau operative (T. (5/21) at 83), plus the lack of any record basis for understanding what is involved in reversing a relay, precludes decision on the latter point.

189. See, e. g., Civil Action 75–169, Doc. No. 179 at 2–3.

190. *Id.*

191. See, Civil Action 75–103, Doc. No. 107 at 2; Civil Action 75–169, Doc. No. 181 at 2. Other prior art is claimed to be deficient for not disclosing Automatic Volume Control (AVC), a feature disclosed in Chaveau.

have an adequate basis for resolving the conflict.

■ To be sure, the task of developing an adequate record has been complicated by plaintiffs' failure to clearly articulate a theory of why the Molinaro combination would not have been obvious to one skilled in the art. As I understand the law, however, the party moving for a summary judgment on grounds of obviousness has the burden of satisfying the Court that no genuine issue remains for trial. It may well be that a skilled artisan, who (as plaintiffs argue) would be so familiar with signal seeking receivers incorporating AFC that he would read AFC into the Molinaro disclosure despite the lack of express reference to it, would (as Raytheon contends) find it obvious to combine the AFC feature with the Chaveau circuitry. For all this record shows, however, there may have been apparent technical problems which would have led the skilled artisan to conclude that the Molinaro combination could not effectively be accomplished. In short, Raytheon has failed to provide a record basis for determining the apparent compatibility or incompatibility of the Chaveau technology and the state-of-the-art receiver technology at the time of the Molinaro invention. While it is true that plaintiffs have presented nothing concrete in the way of negative teaching, synergistic effect or other basis for a finding that the Molinaro combination was not obvious, since Raytheon has the burden of demonstrating the absence of a genuine issue for trial, it cannot prevail on its motion.

## VII. APPLICATIONS FOR ATTORNEYS' FEES

As previously noted, defendants Bendix, Honeywell and Masco have coupled their applications for summary judgment of non-infringement with what amount to applications for summary judgment respecting attorneys' fees. In light of the conclusion reached in Section V, *supra,* that decision on the merits of Honeywell's motion be postponed, Honeywell's application must be treated as premature.

The Masco and Bendix motions present novel questions. While there are many precedents which articulate the general standards governing the award of attorneys' fees to a successful defendant, I have found no comparable case applying those standards to *pro se* plaintiffs.

■ It is, of course, well settled that a successful defendant may be awarded attorneys' fees if he can demonstrate that the litigation was either brought or maintained in bad faith—that is, with actual knowledge that the claim lacked merit. Clearly this rule should be applied to unrepresented parties in the same manner as to represented ones. Certain cases relied upon by Bendix and Masco have gone somewhat further, however, and have imposed liability for attorneys' fees where it was shown that suit was brought or maintained with reckless indifference to whether the underlying claim was meritorious. Application of such a principle is necessary in some factual context to discourage plaintiffs from taking a "head in the sand" approach which can unjustifiably subject innocent parties to factually and/or legally frivolous litigation. While *pro se* plaintiffs should not be held immune from the application of this rule, some caution is warranted, I believe, in applying it to unrepresented litigants, lest the judicial system unduly chill the prerogative of self-representation. A court should not infer a reckless approach to litigation from a mistake of law or fact or from an unreasonable position taken, without some clear understanding of what has occasioned the litigant's lack of representation and of how he came to make that mistake or take that position. I do not believe this kind of caution need exact too great a toll in unnecessary legal expense if the discovery and summary judgment rules are applied by the courts in a reasonable manner.

In the present case, the record before me does not rule out either the possibility of bad faith or the possibility of self-induced myopia. Neither does it, however, affirmatively establish either situation with respect to plaintiffs' litigation against Masco and Bendix.

In the case of Masco, plaintiff Catanzaro specified accused devices which, so far as the record shows, may have infringed if the patent were capable of a construction which covered termination-of-signal devices. I have held, of course, that such a construction is wholly untenable as a matter of law. This does not answer the critical questions, however. While it is apparent to me from the papers and my questioning of Mr. Catanzaro that he suffers at least from a gross misconception of the principles of patent law, this exposure has not convinced me either that he subjectively realized that his position was legally untenable, or that he has maintained his position recklessly. Mr. Catanzaro has not been deposed concerning his motives for bringing and maintaining the case against Masco; whether he has received legal advice from any source; what he personally has done to try to ascertain the merit of his position respecting the scope of the patent; and what motivated his decision to represent himself. About the only thing that is clear to me in this "mistake of law" area is that plaintiff has construed rulings in other courts permitting termination-of-signal device discovery as legal precedent, at least for maintaining his position. On this record, I am unwilling to grant Masco's motion.

The situation with Bendix is similar but differs in two respects. First, plaintiffs have deliberately failed to pursue discovery which promised to put to rest any lingering doubt about infringement. This could, of course, be evidence of either bad faith or a head-in-the-sand approach. I think it also possible, however, that this failure may have resulted from plaintiffs' oft-articulated, though erroneous, view that they are legally entitled to take all discovery they choose in any manner they choose, coupled with a determination to protest what they believed to be unjustified judicial restraint. On the present record, I cannot say that this latter explanation is less likely than the former.

The Bendix situation also differs because plaintiffs identified no specific accused devices in their complaint and have failed to establish that they had any specific Bendix product in mind when they filed it. On February 17, 1976, I held that plaintiffs' failure to produce anything other than the trade journals in support of their claim of infringement justified a limitation on discovery under Rule 56(f). Today, after having afforded plaintiffs an opportunity for discovery which they chose not to pursue, I have further held that these trade journals do not satisfy the plaintiffs' burden under Rule 56(e) to show by competent evidence that there is a dispute of material fact for trial. I have also today observed that I find nothing in the trade journals which suggests infringement to me. I am not prepared to hold on the present record, however, that Bendix has affirmatively demonstrated bad faith or recklessness on the part of plaintiffs. This is not a case where the plaintiffs have been shown to have possessed and/or ignored information demonstrating non-infringement.[192] This is a case where the plaintiffs, who apparently lack both legal expertise and technical expertise in the legally relevant area, did not have access to product information in the area in which they asserted that infringement occurred. It is in this context that the Court must evaluate the question of whether plaintiffs have been guilty of bad faith or a "head-in-the-sand" approach to litigation. I am unwilling to reach either conclusion without more information on how plaintiffs came to take the position they have taken with respect to their claim against Bendix. Accordingly, the application for an award of counsel fees will be denied.

## VIII. CONCLUSION

To summarize, I today hold that the Molinaro patent cannot reasonably be construed as covering signal seeking receivers which restart their scanning only upon termination of the received signal. Secondly, since there is no genuine dispute that the signal seeking receivers produced by Masco restart

**192.** Compare *Kaechni v. Diffraction Co.,* 342 F.Supp. 523, 531–32 (D.Md.1972).

**446**

only in this fashion, i. e. upon termination of signal, Masco is entitled to summary judgment of non-infringement. Third, since there is no genuine dispute that the commercially available signal seeking receivers manufactured by Bendix Corp. do not restart scanning automatically (in any fashion); since plaintiffs concede that their sole remedy respecting devices manufactured for the United States Government is in the Court of Claims; and since there is no genuine dispute that Bendix does not manufacture any signal seeking receivers for foreign governments (plaintiffs having failed to avail themselves of the limited discovery respecting this issue to which Rule 56(f) entitled them) and since, in any event, plaintiffs' allegations of infringement in the foreign government area are limited to termination of signal devices; I have held that Bendix is entitled to summary judgment of non-infringement so far as devices produced either commercially and for foreign governments are concerned, and to a dismissal of Civil Action 75–169 (without prejudice) so far as devices made for the United States Government are concerned.

I also hold that further proceedings are necessary before Honeywell's motion for summary judgment and before plaintiffs' Rule 56(f) application respecting Honeywell can be ruled upon.

Lastly, because Raytheon has failed to demonstrate that no genuine issue of material fact exists respecting the validity of the Molinaro patent, as interpreted to cover time interval restart devices, its motion for summary judgment of invalidity will be denied.

On November 23, 1976 at 2:00 P.M. a conference shall be held among the Court and all parties, both to these cases and to those from the Middle District of Pennsylvania to which I have recently been assigned, to determine an appropriate form of order and to discuss further proceedings in all of the cases. The general stays of discovery imposed in Civil Action 75–103 and Civil Action 75–169 remain in effect pending the outcome of that conference.